# EXHIBIT C

# The Ambushed Grand Jury Citizens' Investigation: Government Criminal Activity during the Rocky Flats Grand Jury Investigation

*By: Jon Lipsky, Wes McKinley, Jacque Brever and Caron Balkany, Esq.*
*January 5, 2005*

## Introduction

This memo analyzes some of the potentially criminal acts by the Justice Department and the Department of Energy ("DOE") which obstructed the 1989-1992 Special Grand Jury investigation of Rocky Flats Nuclear Weapons Plant. Based on a seven year Citizens' Investigation, the writers - former FBI Special Agent Jon Lipsky; Rocky Flats Grand Jury Foreman and Colorado State Rep.-elect Wes McKinley; Rocky Flats whistleblower Jacqueline Brever; and their attorney Caron Balkany -- believe that this government deception is dangerous and illegal and has interfered with the development of a safe and thorough cleanup of Rocky Flats. The government deception about Rocky Flats – past and present - is endangering the public being invited to participate in recreation there. The writers believe that their documentation of some of the Justice Department and Department of Energy deception of the public, Congress and the Courts should result in extreme skepticism about current government assurances that the cleanup of dangerous contamination at Rocky Flats is protective of the public health.

## History

The FBI raid on Rocky Flats Nuclear Weapons Plant was the first time in history that the FBI had served a search warrant on the U.S. government. The raid itself lasted 19 days and involved hundred of witnesses and more than a million documents. There was a Special Grand Jury investigation which lasted almost three years.

At the end of the investigation, the Justice Department did not prosecute anyone from either the Department of Energy or Rockwell International, the defense contractor which operated the plant for the U.S. government. Instead, the Justice Department entered into a plea bargain with Rockwell -- which paid a fine -- and then the Justice Department, on behalf of the United States government, made several

1

official statements exonerating Rockwell, which Rockwell required as a condition precedent to settlement. [1] Later, there were allegations of a government coverup, and members of the Special Grand Jury requested then-President-elect Clinton to authorize an independent prosecutor to investigate the Justice Department.

In January, 1993, a congressional investigation – with bi-partisan support – determined that the Justice Department's handling of the Rocky Flats Grand Jury investigation had "bargained away the truth." But because of Justice Department interference and delay, the congressional investigation was not complete. [2]

In 1997, Wes McKinley, the Foreman of the Rocky Flats Grand Jury, and his volunteer lawyer started a Citizens' Investigation of the Justice Department's actions during the Rocky Flats Grand Jury investigation. They were later joined by Jon Lipsky, the FBI Special Agent who had led the raid on Rocky Flats, and Jacque Brever, a former plutonium worker who had been one of the main Grand Jury witnesses. The Citizens' Investigation uncovered evidence that the Justice Department had covered up criminal actions by the U.S. Department of Energy and Rockwell International and had made false statements to the public, the Court, and to Congress about the Rocky Flats Grand Jury investigation. [i] The Citizens' Investigation resulted in a non-profit, non-fiction book, ***The Ambushed Grand Jury: How the Justice Department Covered Up Government Nuclear Crimes and How We Caught Them Red Handed*** (The Apex Press 2004; www.ambushedgrandjury.com).

### Justice Department Obstruction of an FBI Agent

According to former Special Agent Jon Lipsky, the lead FBI agent for the investigation of Rocky Flats:

1.  The Justice Department restricted him and his team of FBI agents in the scope of the investigation, the types of crimes which would be investigated, the law

---

[i] This memo is not an exhaustive catalog of the evidence of Justice Department and Department of Energy wrongdoing at Rocky Flats. For instance, the documents from the Rocky Flats Grand Jury investigation which would reveal further wrongdoing have been sealed in a Grand Jury vault since 1992. Requests by these authors and the regulators to the Justice Department to release these documents for review have been denied. The writers and others will soon file a Court petition requesting release of these materials.

2

which would be used, the time frame and the subjects of the investigation. Although the law requires a full and complete investigation before a plea bargain can be reached, the Rocky Flats investigation was incomplete at the time the decision to settle was made. [3] Nonetheless, the Justice Department misrepresented to Congress, the Court, and the public that the Rocky Flats Grand Jury investigation had been complete and thorough and that the most serious criminal actions had been charged in the plea agreement. [4]

2.  During the congressional investigation, Justice Department lawyers restricted Lipsky's ability to fully answer questions by using an overbroad and foundationless application of Rule 6(e) which he has never seen used before or since.

3.  He was involved in an investigation of potential strontium contamination at Rocky Flats when the Justice Department decided to plea bargain the case. He protested that his investigation was not complete, and that it involved a potential public health concern. The Justice Department ignored these public health concerns and stopped the investigation, but did not tell the Court or Congress during the congressional hearings.

4.  After he testified to Congress, Lipsky was retaliated against in his job at the FBI. When he used his vacation time in August 2004 to come to Denver to talk about the dangers of recreation at Rocky Flats, the FBI muzzled him. He therefore took early retirement on December 31, 2004 so that he can speak truthfully about the Justice Department obstruction of justice and the dangers of recreation at Rocky Flats.

5.  There were many important areas of the criminal investigation of Rocky Flats which were not properly investigated because of the plea bargain. It would be a grave mistake for anyone – the public, the Courts, those who are regulating the cleanup or deciding whether to allow recreation at Rocky Flats --to rely on what the Justice Department or the Department of Energy has said about the level, extent or location of contamination at Rocky Flats based on that investigation.

6.  Some other areas of investigation which the Justice Department cut short also have critical bearing on the cleanup of Rocky Flats and the decision to open it to recreation. These include investigation into data tampering and falsification, and

routine tampering with the radiation and environmental monitors; [5] knowing endangerment of workers; and illegal on-site radioactive waste disposal practices.

## Justice Department and Department of Energy False Statements and Obstruction of Justice

### False Statements about the Fluid Bed Incinerators

Rocky Flats started development of a fluidized bed incinerator (fbi) in the late 1970s. Its purpose was to burn mixed radioactive hazardous waste to reduce the volume of stored waste on-site. The fluid bed incinerators used a non-combustion chemical process to destroy the waste. There were two fluid bed incinerators, one a pilot plant approximately 1/9 the size of the other unit. The fluid bed incinerators were never permitted or approved to burn hazardous or mixed radioactive hazardous wastes.

There was a great deal of public opposition to the use of the fbis. The Search Warrant alleges that Rocky Flats was using the fbi without a permit and contrary to its agreement that it would not be so used. [6]

In plea bargaining the criminal case, the Justice Department abandoned this position and represented to the Court, under oath, that "The investigation has not revealed that hazardous or mixed wastes were burned...at any time, in the Building 771 fluidized bed incinerator. " [7]

**Citizens' Investigation Evidence:** The Justice Department representations are false.

    a.    Department of Energy documents reveal that Rocky Flats had used fluid bed incineration to treat 9,691 pounds of coolant/1,1,1-trichloroethane and 201 pounds of oil and scintillation liquids by methods including fluid bed incineration.[8]

    b.    Donald Ziegler, a chemical engineer who had been the research and development supervisor for the fluid bed incinerator in Building 776 and who had helped design them, admitted that the pilot plant fluid bed incinerator had been in operation from approximately 1974 to 1978 and that it operated for about 5,000 hours, treating about 6,000 pounds of waste. The larger version of the 776 incinerator was operated for approximately 490 hours. [9]

c.  Rockwell internal documents indicate radioactive mixed waste had been treated in the fluidized bed incinerator in August 1987 and at other times. [10]

It is thus indisputable that Rocky Flats used the fbis to burn hazardous and mixed radioactive hazardous waste without a permit. This practice was illegal, and the Justice Department's contrary representation to the Court and the public is false and deceptive.

### DOE's False Statements Regarding Building 771 Storage of Plutonium Residues

Section 2.4 of the Search Warrant alleges that "Rocky Flats is using an outdated and unpermitted incinerator in Building 771 to illegally 'treat' at least nine hazardous or mixed wastes in violation of the Resource Conservation and Recovery Act..." [11]

Built as a special nuclear material recovery process to recycle plutonium, the 771 incinerator had turned out to be an unpermitted, unacknowledged incinerator for trash contaminated with lethal radioactive and hazardous wastes.

During the criminal investigation, the FBI found evidence that Department of Energy and Rockwell personnel knowingly used the Building 771 plutonium incinerator to burn mixed hazardous and radioactive wastes without a permit. The 771 incinerator was old, unsafe and needed repairs. It was not protective of the workers or the surrounding citizens. [12] Yet, Rocky Flats used the 771 incinerator to burn over <u>345 tons</u> of hazardous and radioactive waste over 15 years. [13]

When RCRA became effective in the 1980s, the Department of Energy and Rockwell argued that RCRA did not apply to the weapons plants. When finally forced to concede that RCRA did in fact apply, Rocky Flats then argued that the 771 incinerator had a RCRA exemption because it was recycling plutonium from the waste it was burning, not just burning the waste for the purpose of disposing of it. [14]

The exemption from getting a RCRA permit – for which the 771 incinerator would never have qualified – lay in describing it as a plutonium recovery facility, not a waste disposal unit.[ii]

Rockwell and Department of Energy officials made the following representations to the FBI, the Court, and the EPA in connection with that exemption:

a. William Weston, Assistant Plant Manager, formerly Director of Plutonium Operations, told the FBI during the Grand Jury Investigation: "The incinerator processes combustible [plutonium] residue and this could be in the form of rags, plastic, paper or contaminated clothing. It is converted to ash from which they recover plutonium. The ash is dissolved into nitric acid, and then the plutonium is extracted from that solution...."[15]

b. Mr. Weston, in a Court affidavit, swore under oath, that: "The purpose of the SNM [special nuclear material] recovery incinerator is the <u>ongoing</u> processing and recovery of plutonium rather than disposal or discard of wastes."[16]

c. Compliance Order 1053, signed by four Rockwell employees in Operational Compliance and Control, Operations, Health Safety and Environment in 1989, indicates that: "The incinerator processes various burnable plutonium contaminated residues from the plant site. The resulting ash is dissolved in nitric acid processing equipment in Building 771, for plutonium recovery."

d. The Building 771, Final Safety Analysis, prepared by Rockwell with revisions in 1988, states, "The basic purpose of Building 771 operations is to recover plutonium from scrap solids, solid residues, and various liquid process waste streams from plant operations."

e. According to "Comments of the Rocky Flats Plant to the EPA Concerning Proposed Redefinition of Solid Waste," 22 March 1988, signed by General Counsel to the Department of Energy's Rocky Flats Area Office and by Chief Counsel to Rockwell International: "[A]nother major mission of the Plant involves chemical processing to

---

[ii] The distinction between plutonium recovery or plutonium disposal had no difference in terms of public health; whatever the reason for the burn, the fact remained that Rocky Flats was burning hazardous and radioactive waste from a stack that was only 16 miles from Denver and even closer to the rapidly encroaching suburbs around Rocky Flats. The deception allowed Rocky Flats to evade the little regulatory oversight then available.

recover plutonium from secondary materials generated in the fabrication and recovery process."[17]

  f.  Ronald Cochran, Deputy Manager, Department of Energy's Albuquerque Operations Office, wrote to Albert Whiteman, Area Manager, Department of Energy's Rocky Flats Office, concurring in his proposal to consider the 771 incinerator waste exempt from RCRA, 23 October 1987 because plutonium residues "are valuable DOE resources which are recycled to recover the plutonium contents."

  **Citizens' Investigation Evidence:**  Contrary to the above representations, incinerator ash <u>was not</u> dissolved in nitric acid for plutonium recovery; it was stored in drums in Building 771. The dissolution of the ash was tried at various times and did not work. In fact, no plutonium recovery was occurring. Instead, for the ten years prior to the raid, Rocky Flats simply burned massive amounts of contaminated trash and then illegally stored the plutonium laden ash on-site with no re-use or recovery initiated at all. [18] The 771 incinerator did not recover plutonium and did not qualify for a RCRA exemption. The Department of Energy and Rockwell statements to the contrary are false.

  Additionally, the storage of radioactive incinerator ash for ten years was a violation of the Rocky Flats Clean Air Act permit which specifically required that the plutonium either be reprocessed or the ash shipped off-site. The Plea Agreement and the Sentencing Memorandum do not make mention of these violations, which are more serious crimes than those charged in the plea bargain, contrary to the Justice Department's representations. [19] The Justice Department, the Department of Energy, and Rockwell misrepresented the illegal activities which were actually occurring at the Building 771 plutonium incinerator at Rocky Flats as well as what the U.S. government was willing to do about them.

### Misleading Government Statements that There was no Off-site Harm from Rocky Flats, and an Example of How This Has Interfered with the Thoroughness of the Cleanup

In order to justify the fine agreed to with Rockwell, the Justice Department had to demonstrate that there was no off-site harm from the charged conduct. Otherwise, sentencing guidelines and policy might dictate that the fine be higher than what the Justice Department had already agreed to with Rockwell. The Sentencing Memorandum, signed by then-U.S. Attorney Michael Norton, Assistant U.S. Attorney Ken Fimberg, Justice Department Attorney Peter Murtha, and Acting Assistant Attorney General Barry Hartman, states on page 124:

> "...the conduct to which Rockwell has pleaded guilty
> did not result in substantial physiological harm,
> or the imminent threat of substantial physiological
> harm, to members of the public residing and
> working outside Rocky Flats' boundaries."

Contrary to this official government statement, [20] one of the areas which did cause off-site harm was Rocky Flats' practice of spraying radioactive and hazardous waste on-site, particularly at the East Trenches and the East Spray Fields in a disposal practice which the Justice Department admitted was based on Rocky Flats' deception of the EPA. As discussed below, Rocky Flats has continued this deception of the regulators about the spray irrigation practice during development of the cleanup plans.

Rockwell and the Department of Energy submitted Clean Water Act permit renewal applications in 1980 and 1983. Both submissions illegally failed to indicate that "...the sewage treatment plant received industrial or hazardous wastes. Rocky Flats' permit was renewed based on that false submission." [21] In contradiction of its representations to the EPA in its Clean Water Act permit, Rocky Flats, "...from at least the mid-1980's and into 1989, regularly discharged various industrial and hazardous wastes to the sewage treatment plant." [22]

Because of the Rockwell submission that it supposedly was only treating ordinary sanitary sewage, the EPA did not closely monitor the sewage treatment plant. Rockwell's procedural documents – used by EPA to determine Clean Water Act compliance – state that the sewage treatment plant effluent is analyzed prior to discharge. This was not true. [23]

8

Rockwell also sprayed onto old hazardous waste dumps, called the East Trenches. The East Trenches were known to have contaminated the surrounding groundwater. Spraying millions of gallons of water – also contaminated with hazardous and radioactive constituents – further impacted the groundwater plume. "Rockwell knew that its spray irrigation practices caused substantial runoff" into creeks that led to drinking water reservoirs. [24] Rockwell knew that spray irrigating the East Trenches had affected the groundwater plume, so at one time it discontinued the practice. [25] It then recommenced this spraying, even with knowledge that the groundwater was being further contaminated.

The Rocky Flats representations to the regulators were false and the government deception continues today in the cleanup plans for Rocky Flats. To determine the type and extent of cleanup which would be necessary for the East Spray Fields, DOE first had to determine the extent and levels of radioactive or toxic contaminants in the sewage treatment plant effluent which had been sprayed on them. Instead, the Department of Energy relied on old sampling data from the 1980s which it knew was false. The DOE advised the cleanup regulators that: "The analyses of treated sanitary effluent discharged to Pond B-3 and actual analysis of the pond water are representative of the water applied to the East Spray Fields." [26]

The quoted statement from DOE is false, and DOE knew it because the FBI had caught them at it in 1992, and revealed the practice:

(1) The effluent was analyzed only for the constituents which DOE was allowed by its National Pollutant Discharge Elimination System ("NPDES") permit to discharge to the sewage treatment plant ("STP"). [27]

(2) However, DOE has direct knowledge that radioactive and toxic chemicals which were not allowed under the NPDES permit had nonetheless been regularly -- and illegally -- discharged to the sewage treatment plant and that DOE did not analyze or report these contaminants to the regulators. Therefore, as DOE knows, the analyses are not representative of the water which was sprayed on the East Spray Fields, contrary to DOE's representations to the regulators. Some evidence of DOE's knowledge of the falsity of its representation to the EPA include the following:

9

(a) The 1989-1992 Rocky Flats Grand Jury investigation revealed that from the mid-1980s until 1989, DOE "...regularly discharged various industrial and hazardous wastes to the sewage treatment plant, including industrial wastewaters, photographic developers and fixers, contaminated cooling tower blowdown [radioactive], radioactive contaminated laundry water, acid rinsewaters and sump wastes. *** [T]hey accounted for 10% of all wastes sent to the STP." [28]

(b) In the resolution of the criminal investigation of Rocky Flats, Rockwell pled guilty to discharging toxic and hazardous substances to the sewage treatment plant. [29]

To compound its false statement, DOE also advised the regulators and the public that: "Water from Pond B-3, which receives treated sanitary wastewater flows, was applied to these spray fields. This activity was allowed in the National Pollutant Discharge Elimination System (NPDES) Permit of May 1981." [30]

This is totally misleading. As the Justice Department made clear in the criminal disposition of the Grand Jury investigation of DOE and Rockwell in 1992, the NPDES permit was based on DOE's false information in the permit application which failed to inform the EPA that radioactive and toxic wastes were being illegally discharged to the sewage treatment plant: [31]

(1) DOE's contractor Rockwell pled guilty to failing to accurately report the radioactive, toxic, and hazardous wastes in the sewage treatment plant effluent. [32]

(2) The Department of Justice's Sentencing Memorandum, filed as public record with the Court in 1992, describes the falsifications in DOE's NPDES permit. [33]

Further, DOE's cleanup of the East Spray Fields excludes the majority of the contaminated land. Barrels of highly radioactive and chemical wastes were known to have been buried in the East Trenches next to the 903 Pad on the east side of Rocky Flats, and to have rusted out and leaked, adding additional contamination to the soils and groundwater. [34] According to DOE's cleanup documents, the East Trenches were not part of the East Spray Fields. [35] However, it is well known to DOE that the East Trenches are indeed part of the East Spray Fields:

10

(1) The Justice Department's Sentencing Memorandum describes in detail the FBI investigation of the DOE's practice of spray irrigating over the East Trenches and the increased contamination this caused by spreading the highly contaminated waste from the leaking barrels. [36]

(2) The sprinkler pipes which spray irrigated the contaminated effluent during the 1980s were laid out over both the East Trenches and areas even farther west called the 903 lip area, also contaminated, and were visible to workers as they entered the Plant on the East Access Road. [37]

DOE also excludes from the cleanup other large segments of the East Spray Fields: the area of the East Spray Fields irrigated with water contaminated with radioactive and toxic waste is more than three times larger than the area DOE represents on its map. [38] DOE has excluded from cleanup the vast majority of the land which was regularly sprayed with contaminated water.

The fact that millions of gallons of water contaminated with radioactive and toxic chemical wastes were sprayed onto the East Spray Fields means that the area needs to be thoroughly sampled and characterized before determining a cleanup plan. Instead, because of DOE's false representations to the regulators, the cleanup of the East Spray Fields does not address the most dangerous contaminants in the effluent, nor the large majority of the area that was repeatedly contaminated by spray irrigation of that radioactive and toxic effluent.

First, DOE deceived the EPA about the dangerous radioactive and hazardous wastes in the effluent it was spraying on the fields of Rocky Flats. This allowed DOE and Rockwell to continue the practice – which was illegal – for many years, saturating the grounds with radioactive and hazardous waste and causing dangerous contamination to run off-site into streams which reached the drinking water reservoirs. Then, during the Grand Jury investigation, the Justice Department covered up that DOE deception. Now, during the cleanup, DOE continues the deception about both the contaminants in the spray effluent and the amount of land which must be cleaned up because of that illegal practice.

## Justice Department False Statements About the Secret Midnight Plutonium Burning Charges

Secret midnight plutonium burning in violation of a shutdown order had been one of the most controversial of the Search Warrant allegations in 1989. In settling the case, however, the Justice Department represented on behalf of the U.S. government that the criminal plutonium burning during the shutdown period had not occurred: [39]

> The investigation has not revealed that hazardous or mixed wastes were burned in the Building 771 incinerator during {the so-called shut-down period]. [40]

An internal Justice Department review completed on April 8th, 1994, which was also sent to Congress, provides the official government positions on why the secret midnight plutonium burning was not charged.

**First Justice Department Position**: the infrared analyst on whose opinion the prosecutors had based the Search Warrant had "reversed himself and backed away from his prior opinion [that the incinerator had been operating.]"[41]

**Citizens' Investigation Evidence:** The infrared analyst informed the Citizen's Investigation that this Justice Department statement was not true. The infrared analyst, Al Divers, advised the Citizens' Investigation that he had never changed his opinion and that the reports he wrote indicate the incinerator was operating and that he'd told this to the Grand Jury and the prosecutors. [42]

**Second Justice Department Position**: "None of the details [provided by Karen Pitts and Jacque Brever, two plutonium workers who stated the incinerator had been operating] such as the identities of other Rockwell employees supposedly working when this burning occurred – were corroborated."

**Citizens' Investigation Evidence:** A Foreman at the plutonium incinerator has admitted to the Citizens' Investigation that he did some of the secret midnight plutonium burnings during the shutdown at the orders of his superiors. Ron Avery states that he made "special runs" to burn barrels of high gram count radioactive mixed waste in the incinerator on the midnight shifts of December 10th and 11th 1988. He says he was given these orders by Rockwell management, and was not told there was a shutdown in effect.

Importantly, many of the "details" indicating that the incinerator had been run were corroborated, contrary to the Justice Department's position. [43] In any event, the FBI told Congress in private interviews that there was evidence of several "maintenance burns" during the shutdown and that "maintenance burns" were the same as normal operations. It was "just semantics." [44] The testimony of these FBI agents to Congress directly contradicts the sworn pleadings filed by the Justice Department as well as their public statements that the midnight burning had never occurred.

## Citizens' Investigation Conclusion

The U.S. Department of Energy repeatedly lied to the regulators, Congress and the public about its illegal activities at Rocky Flats which resulted in widespread contamination on-site and off-site of the plant. The U.S. Justice Department obstructed a Special Grand Jury, Congress, and an FBI agent, and lied to the Court and the public about the extent of the contamination and government crimes at Rocky Flats. Now, the Department of Energy is continuing its deception during the cleanup, having the arrogance to repeat a lie it's already been caught at once before.

Formerly the most contaminated Superfund site in Colorado, Rocky Flats Nuclear Weapons Plant is now scheduled to become Rocky Flats National Wildlife Refuge in December 2006, and plans are underway to open Rocky Flats to recreation. Much of the evidence concerning the extent of the dangerous contamination at Rocky Flats has never been made available to Congress, the public, or even to the Department of Energy consultants developing the cleanup plans for Rocky Flats. [45]

Congressional intervention is necessary to remedy the Justice Department's abuse of power and the public health risks that abuse of power has created. Most importantly, the public and the regulators need be cautious about the dangers of relying on government assurances that the cleanup of Rocky Flats has been protective of the public health. The Department of Energy has repeatedly deceived the public and even other government officials about the extent of the contamination at Rocky Flats, and its continuing deception demonstrates that there is no reason to believe that this pattern of deception has changed.

# References

[1] For instance, Justice Department prosecutor Peter Murtha admitted during a 1992 congressional investigation into the Justice Department's handling of the Rocky Flats Grand Jury investigation that the prosecution team decided not to detail any evidence it had of off-site harm from the solar ponds because Rockwell was afraid of increasing its exposure to civil damage claims from adjoining property owners. Vol. III, 357-358. (Citations to "Vol. __, ____" etc. refer to Wolpe, Howard, Congressman, Chairman, Subcommittee on Investigations and Oversight, Committee on Science, Space and Technology, U.S. House of Representatives, *The Prosecution of Environmental Crimes at the Department of Energy's Rocky Flats Facility*, 4 January 1993 and Subcommittee Hearing transcripts, Volume I, II, and III.

[2] Named after its Chairman, then-Michigan Congressman Howard Wolpe, the Wolpe congressional investigation's formal name was "Hearings Before the Subcommittee on Investigations and Oversight of the Committee on Science, Space and Technology, U.S. House of Representatives."

During the hearings, Rep. Wolpe asked Special Agent Lipsky to write a memo to the Investigations and Oversight Committee listing the changes in environmental laws which Lipsky thought would help facilitate prosecution of environmental wrongdoers. Lipsky complied. Presumably believing that Justice Department prosecutors were testifying truthfully to his congressional investigation, Chairman Wolpe did not ask Special Agent Lipsky to write a memo detailing the Justice Department's wrongdoing during the Grand Jury investigation of Rocky Flats. Some of that information is presented here.

[3] The U.S. Attorney's Manual requires prosecutors to conduct a complete investigation before settling charges. The United States Supreme Court has ruled that "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way...."

[4] *USA v. Rockwell International*, Case # 92-CR-107, United States District Court, Denver, Colorado, Sentencing Memorandum, 4: The Justice Department has charged "...the most serious environmental violations for which sufficient evidence exists to support a successful prosecution and conviction."

Then-U.S. Attorney Michael Norton: "...we charged all of the significant criminal conduct that was found." Vol. I, 317.

[5] FBI interviews, Timothy Trout, 10-26-89 and 2-15-90.

[6] Op. Cit., *USA v. Rockwell International*, Plaintiff's Sentencing Memorandum, 108.

[7] Op. Cit., *USA v. Rockwell International*, Plea Agreement, 4. According to Special Agent Lipsky, this official statement was required by Rockwell as a condition precedent to settlement.

[8] Rocky Flats Nuclear Weapons Plant, 1985 Part A RCRA Application and Revised Part A RCRA Application.

[9] FBI interview, Donald Ziegler, 4-90.

[10] Vol. II, 272, 274, 344, 348 and 373.

<sup>11</sup> Before the raid, many people never even knew that the 771 incinerator at Rocky Flats had been incinerating plutonium contaminated hazardous waste since the 1950s. That included state and federal regulators. In a January 23rd, 1987 article in *The Rocky Mountain News*, Janet Day reported that, "State health officials and officials at the Environmental Protection Agency were unaware of the plutonium recovery incinerator until recently and even yesterday were scrambling to find out what permits, if any, had been issued for the operation."

In that same article, a Rocky Flats spokesman is quoted as saying, "There is no waste in the incinerator. It processes material that are recovered and used again." This is false. See, *infra* at pages 8-9.

<sup>12</sup> Vol. I, 26.

<sup>13</sup> Preliminary Analysis, Air Pollution Control Division, Colorado Department of Health, 11 July 1985; Unsigned, undated Incinerator History; Unsigned, Incinerator Fact Sheet, 12 November 1987.

<sup>14</sup> Op. Cit., *USA v. Rockwell International*, Plaintiff's Sentencing Memorandum, 19-25.

<sup>15</sup> William Weston, *FBI interview*, 16 June 1989.

<sup>16</sup> William Weston, Second Affidavit, <u>Sierra Club vs. Rockwell and the U.S. Department of Energy,</u> etc., Civ. Case # 89-8-181, United States District Court, District of Colorado, emphasis supplied.

<sup>17</sup> Vol. I, 1509-1522.

<sup>18</sup> Op. Cit., *USA v. Rockwell International*, Affidavit in Support of Search Warrant, 27. Also, Caron Balkany, interviews, Ron Avery and Jacque Brever, 2001.

<sup>19</sup> Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 4: The Justice Department has charged "...the most serious environmental violations for which sufficient evidence exists to support a successful prosecution and conviction. (Then-U.S. Attorney Michael Norton: "...we charged all of the significant criminal conduct that was found." Vol. I, 317.

<sup>20</sup> In 25 January 1988 "Inventory of Federal Hazardous Waste Activities," the Rocky Flats Area Manager, Albert Whiteman, submitted to the Department of Energy Headquarters a statement indicating that the East Trenches had released contamination to the environment and that the contamination had affected contiguous or adjacent property. Vol. II, 922-923.

The Justice Department noted: "Rockwell knew that its spray irrigation practices caused substantial runoff" into creeks that led to drinking water reservoirs. *** It was known that "... the ponds were leaking and contaminating the surrounding groundwater.... causing substantially elevated nitrate, chemical and radioactive contamination." Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 51, 82.

<sup>21</sup> Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 67.

<sup>22</sup> Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 67, 69-70.

<sup>23</sup> Op. Cit., *USA v. Rockwell International* Sentencing Memorandum, 91.

<sup>24</sup> Op. Cit., *USA v. Rockwell International* Sentencing Memorandum, 82.

<sup>25</sup> Vol. III, 923.

<sup>26</sup> Department of Energy, *Historical Release Report*, 2003 update, 24-27.

[27] Op. Cit., *Historical Release Report*, 1992, DOE, NE-33 to NE-36.

[28] Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 69-70.

[29] Op. Cit., *USA v. Rockwell International*, Plea Agreement, 4.

[30] Op. Cit., *Historical Release Report*, 1997 update, 48.

[31] Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 66-67.

[32] Op. Cit., *USA v. Rockwell International* Plea Agreement, 4.

[33] Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 67-69.

[34] DOE, July 2002, *First Five-Year Review for RFETS*, 55-60.

[35] Appendix A, Map 1, DynCorp for DOE, Plate 1, *Individual Hazardous Substance Sites by Consolidated Operable Unit, Historical Release Report Update*, August 1, 2002 - August 1, 2003.

[36] Op. Cit., *USA v. Rockwell International*, Sentencing Memorandum, 81-82.

[37] Personal observations of author Jacque Brever and recorded observations from other Rocky Flats workers, July 2004.

[38] Appendix A, Map 2, Jacque Brever, 2004, *Area of Contaminated Spray Irrigation Acknowledged by DOE Compared to Area of Spray Irrigation as Described by the FBI and Former Workers But Excluded From Cleanup By DOE.*

[39] Rockwell required this in order to settle, according to Jon Lipsky.

[40] Op. Cit., *USA v. Rockwell International*, Plea Agreement, 4.

[41] This official position was also stated publicly by Assistant U.S. Attorney Ken Fimberg. Barry Siegel, *The Los Angeles Times*, 8 and 15, August, 1993.

See, also, Caron Balkany, interview, Kenneth Fimberg/Scott, 10-01.

'A Justice Department Prosecutor' made a similar statement. Caron Balkany, interview, 'A Justice Department Prosecutor,' 6-01.

[42] Caron Balkany, interviews, Al Divers, 9-00.

[43] Air samplers located in the incinerator exhaust plenum which measure radioactivity in the exhaust read higher during the month of the secret midnight burning than in November or January and were compatible with the levels during five months when Rockwell and Department of Energy officials admitted the incinerator had been running. 6-19-89 Department of Energy Special Report.

The only equipment which used liquid oxygen was the 771 incinerator. Delivery logs showed multiple liquid oxygen deliveries to Building 771 during the months of the Department of Energy-ordered shutdown. Vol. II, 1182-1186.

[44] Vol. I, 829, 1169.

[45] Dr. John Till, who headed a team of scientists helping to develop the cleanup levels at Rocky Flats, asked for the documents which had been presented Grand Jury, but his request was denied. Caron Balkany, interview, Dr. John Till, 7-26-03.

The current U.S. Attorney, John Suthers, has also denied the regulators access to the documents. Caron Balkany, private conversations with Steve Gunderson, 2004.