EXHIBIT
S

DENNIS CUNNINGHAM (#112910)
ROBERT BLOOM
3163 Mission Street
San Francisco, CA 94110
415-285-8091 / fax: 285-8091

J. TONY SERRA (#32639)
506 Broadway
San Francisco, CA 94133
415-986-5591; fax: 421-1331

*et al.*, Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF JUDI BARI, and DARRYL CHERNEY, <br><br> Plaintiffs, <br><br> vs. <br><br> FBI Special Agent FRANK DOYLE, Jr., *et al.*, <br><br> Defendants. | Case No. C-91-1057 CW (JL) <br><br> **OFFER OF PROOF (AMENDED)** <br><br> May 14, 2002 <br> Judge WILKEN |

### PLAINTIFFS' OFFER OF PROOF REGARDING FBI MISCONDUCT

Plaintiffs move this Court for leave to submit evidence of uncharged FBI misconduct, subject to a cautionary or limiting instruction, on several grounds. The Court's rulings on motions *in limine* included an order that plaintiffs could not introduce evidence of COINTELPRO or other misdeeds by the FBI to the extent that plaintiffs could not tie such acts to the individual defendants. Plaintiffs respectfully ask the Court to revisit its decision excluding such evidence in light of the arguments set forth below and the appendix filed herewith.

# Contents

I.  Offer of proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  Report of proposed expert Howard Zinn,
        Professor Emeritus, Political Science, Boston University. . . . . . 4
    B.  Deposition of proposed expert Flint Taylor, Jr.,
        Esquire, June 20, 2001. . . . . . . . . . . . . . . . . . . . . 7
    C.  *Select Committee to Study Governmental Operations with
        Respect to Intelligence Activities,* Church Report:
                --*Introduction and Summary*
                --*Major Finding*
                --*Conclusions and Recommendations*
                --COINTELPRO:  The FBI's Covert Action Programs
                    Against American Citizens. . . . . . . . . . . . . 9
    D.  Senator Edmond Muskie denouncement
        of FBI's activities on Earth Day 1970. . . . . . . . . . . . . .  14
    E.  COINTELPRO targeting of Geronimo ji jaga (Pratt) . . . . . . . .15
    F.  COINTELPRO targeting of Frank Wilkinson. . . . . . . . . . .  17
    G.  U.S. House of Representatives' Committee on Government
        Reform, 2001 – the Boston Informant's Case. . . . . . . . . .  19
    H.  CISPES (Committee In Solidarity
        with the People of El Salvador) . . . . . . . . . . . . . . . . .  22
    I.  Birmingham Bombing Case. . . . . . . . . . . . . . . . . . . .  26
    J.  Richard Jewell. . . . . . . . . . . . . . . . . . . . . . . . . .  27
    K.  Wen Ho Lee. . . . . . . . . . . . . . . . . . . . . . . . . . .  32

II. Arguments for admission of evidence of prior FBI misconduct. . . . . .  34
    A.  The evidence is admissible to show the FBI's 65-year policy
        and practice of engaging in similar misconduct – on
        the issue of unlawful motive . . . . . . . . . . . . . . . . . . .34
    B.  Prior FBI misconduct is no less relevant to the actions
        of the individual FBI agents as it would be had the United
        States remained a defendant  . . . . . . . . . . . . . . . . . .  36
    C.  By his testimony that he acted in good faith and relied
        on his knowledge of the FBI's good reputation in not
        questioning FBI-supplied information, Sitterud opened
        the door to be examined on his knowledge of specific
        instances of FBI misconduct. . . . . . . . . . . . . . . . . . .  36
    D.  By his testimony that he acted in good faith and relied
        on his knowledge of the FBI's good reputation in not
        questioning FBI-supplied information, Sitterud opened
        the door to character evidence of FBI misconduct. . . . . . . . .  38
    E.  To the extent that FBI defendants' defense is good faith
        mistake, prior similar misconduct is admissible to show
        the absence of mistake . . . . . . . . . . . . . . . . . . . . .  39
    F.  FBI misconduct evidence is admissible on
        a proper assessment of punitive damages. . . . . . . . . . . .  41
    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . .  43

LAW OFFICE OF
DENNIS CUNNINGHAM
SAN FRANCISCO, CA

# A-P-P-E-N-D-I-X

Tab A: Deposition of proposed expert Flint Taylor, Jr., Esquire, June 20, 2001 (Excerpts)

Tab B: Select Committee To Study Governmental Operations With Respect To *Intelligence Activities*, United States Senate; Together with Additional, Supplemental, and Separate Views, April 26, 1976; Book III; *COINTELPRO: The FBI's Covert Action Programs Against American Citizens*

Tab C: February 2, 1983, Declaration of Douglass E. Mirell, Esquire, Frank Wilkinson et al. v. Federal Bureau of Investigation, et al., CD CA, No. 80-01048

Tab D: Elmer Jeronimo Pratt vs. The City of Los Angeles, et al., Case No. 98-4237, First Amended Complaint

Tab E: *Why Did the F.B.I. Hold Back Evidence?*, N.Y. Times Op-Ed, May 3, 2001, B. Baxley.

---

## I. Offer of proof

This Court may, consistent with the Federal Rules of Evidence, admit the testimony in the form of an opinion of the two of plaintiffs' experts, referred to below under sections A and B. Some of the documents in the Appendix filed herewith were relied on by plaintiffs' experts, and others in the Appendix are admissible as properly authenticated and do not contain inadmissible hearsay.

> **Summary:** Plaintiffs proffer the testimony of two experts on the policy and practice of COINTELPRO – the purpose of which was to maintain the existing social and political order by the use of techniques carrying a serious risk of physical, emotional, and economic damage. The techniques also include callous disregard of clearly established law, the prevention and disruption of the exercise of First Amendment rights by the use of propaganda, bogus mailings and pamphlets, the use of informants, fictitious organizations, the use of hostile third parties to raise controversial issues against targeted groups, and the dissemination of derogatory information and the interference with and abuse of the judicial process. Plaintiffs' proof also includes evidence of the FBI's practice of using state authorities to conduct raids, make arrests, and prosecute cases based on spurious charges. The use of all such FBI practices are present in the instant case. The offer shows a 65-year history of such policy and practices, continuing to the present day.

3

**A.  Report of proposed expert Howard Zinn,
    Professor Emeritus, Political Science, Boston University**

Plaintiffs' proffer of Professor Zinn's testimony was the subject of a motion *in limine*, and the Court ruled that testimony, regarding the FBI's *modus operandi* of COINTELPRO, inadmissible. As plaintiffs ask that the Court reconsider its ruling on the matter, Zinn's expert Report is set forth below.

---

Howard Zinn
Auburndale, MA 02466
April 30, 2001

Dear Mr. Cunningham:

It is my considered opinion, knowing of the car bomb explosion which injured Judi Bari and Darryl Cherney in 1990, and knowing of their speedy subsequent arrest on sensational criminal charges, that the apparent 'frame-up' of the two as supposed bombers — as reflected in the evidence described in the "big brief" from *Bari v. USA* — is consistent with the history of the Federal Bureau of Investigation. That history, for many years before 1990, and continuing after that, shows that the FBI has repeatedly attempted to harass, injure, even cause the death of individuals in order to disrupt the activities of organizations critical of government and the Establishment.

That history indicates that in the pursuit of this disruption, the FBI has again and again violated the constitutional rights of Americans, including their right to freedom of speech and freedom of association. It indicates that the FBI would have been ready, willing and able to pervert the Constitution, and their own law enforcement responsibility under it, in the ways the plaintiffs allege, in the attempt to discredit and "neutralize" a movement like Earth First! and other allied forces working to preserve and protect the environment.

The most powerful evidence for my claim, buttressing my opinion, is in the government's own documents, chiefly the Final Report of the Select Committee to Study Governmental Operations With Respect to Intelligence Activities, of the United State Senate, published in 1976 by the Government Printing Office (informally known as the Church Committee).

That report details the covert activities of COINTELPRO (standing for Counterintelligence Program), an FBI program designed, as the Committee report says, to "disrupt" and "neutralize" target groups and individuals. The Church

4

| | |
|---|---|
| 1 | committee's report was based, it says, on a staff study of more than 20,000 pages of Bureau documents, depositions of many of the Bureau agents involved in the programs, and interviews of several COINTELPRO agents. |
| 2 | |
| 3 | COINTELPRO began in 1956 "in part because of frustration with |

committee's report was based, it says, on a staff study of more than 20,000 pages of Bureau documents, depositions of many of the Bureau agents involved in the programs, and interviews of several COINTELPRO agents.

COINTELPRO began in 1956 "in part because of frustration with Supreme Court rulings limiting the Government's power to proceed overtly against dissident groups" and was claimed to have ended in 1971, the committee report says, "with the threat of public exposure." That the **FBI tactics, violating constitutional rights, described in the committee report, was not confined to those years, is clear from what it was doing before 1956 and after 1971, so that its actions against Judi Bari and Earth First in 1990 do not represent a departure from its history.**

The violations of constitutional rights go back to the first World War, when the long-time, powerful head of the FBI, J. Edgar Hoover, was in charge of the Bureau of Investigation, predecessor to the FBI. According to the FBI's own document, quoted in the Church committee report (p. 381) there was a "mass deprivation of rights incident to the deserter and selective service violator raids in New York and New Jersey in 1918..." What happened is that 35 Bureau Agents assisted by police and military personnel and a "citizens auxiliary" of the Bureau, "rounded up some 50,000 men without warrants of sufficient probable cause for arrest."

In 1920 the Bureau, along with Immigration Bureau agents, carried on the "Palmer Raids" (authorized by Attorney General A. Mitchell Palmer), which, in 33 cities rounded up 10,000 persons. The Church Committee report (p.384) talks of "the abuses of due process of law incident to the raids," quoting a scholarly study (Robert Preston, *Aliens And Dissenters*) that these raids involved "indiscriminate arrests of the innocent with the guilty, unlawful seizures by federal detectives..." and other violations of constitutional rights.

The Church committee (p.385) cites a report of distinguished legal scholars (Roscoe Pound, Felix Frankfurter and others) made after the Palmer Raids, and says the scholars "found federal agents guilty of using third-degree tortures, making illegal searches and arrests, **using agents provocateurs....**"

When in 1924, Harlan Fiske Stone became Attorney General, he succeeded in temporarily halting the unconstitutional activities of the Bureau, saying: "When a police system passes beyond these limits [conduct forbidden by law] it is dangerous to the proper administration of justice and to human liberty." (quoted in Morton Halperin et al, *The Lawless State*, p. 95)

World War II brought a return of the FBI to counterintelligence operations as President Franklin D. Roosevelt in a 1940 memorandum gave the FBI the power to use warrantless wiretaps against suspected subversives. This was contrary to a Supreme Court decision of 1937 (Nardone v. U.S.) saying that a Congressional statute making it a crime for "any person" to intercept wire communications applied to federal         agents also.

5

COINTELPRO developed out of the anti-Communist hysteria of the cold war years, but led to FBI actions against groups that had nothing to do with Communism. The Church committee reports that **COINTELPRO,** presumably set up to protect national security and prevent violence, actually **engaged in other actions "which had no conceivable rational relationship to either national security or violent activity.** The unexpressed major premise of much of COINTELPRO is that the Bureau has a role in **maintaining the existing social order,** and that its efforts should be aimed toward combating those who threaten that order." (p.7)

This meant that the Bureau would **take actions against individuals and organizations simply because they were critical of government policy.** The Church committee report gives examples of such actions, violations of the right of free speech and association, where the FBI targeted people because they opposed U.S. foreign policy, or criticized the Chicago police actions at the 1968 Democratic National Convention. The documents assembled by the Church committee **"compel the conclusion that Federal law enforcement officers looked upon themselves as guardians of the status quo"** and cite the surveillance and harassment of Martin Luther King Jr. as an example of this. (p.7)

The report quotes former Assistant to Director Hoover, William C. Sullivan: "This is a rough, tough, dirty business, and dangerous.... **No holds were barred."** The Church committee says: "In the course of COINTELPRO's fifteen year history, a number of individual actions may have **violated specific criminal statutes,** a number of individual actions **involved risk of serious bodily injury or death to the targets** (at least four assaults were reported as 'results'....)"

Was that "rough, tough, dirty business" confined to the official life-span of COINTELPRO (1956 to 1971)? The Church committee's report discusses this question. "If COINTELPRO had been a short-lived aberration, the thorny problems of motivation, techniques, and control presented might be safely relegated to history. However, COINTELPRO existed for years on an 'ad hoc' basis before the formal programs were instituted, and more significantly, **COINTELPRO-type activities may continue today under the rubric of 'investigation.'"** (p.12)

The Church committee cites the testimony in 1975 of FBI director Clarence M. Kelley as indication that even after the official end of COINTELPRO, "faced with sufficient threat, covert disruption is justified." (p. 14)

The FBI continued to violate the constitutional rights of citizens through the 1980's, up to 1990, as revealed by Ross Gelbspan in his book *Break-Ins, Death Threats And The FBI.* Utilizing thousands of pages of FBI documents secured through the Freedom of Information Act, Gelbspan found that activists who opposed U.S. policy in Central America "experienced nearly 200 incidents of harassment and intimidation, many     involving...break-ins and thefts or

6

rifling of files." (p.1) Gelbspan's intent was to "add a small document to the depressingly persistent history of the FBI as a national political police force." The Bureau's proper function is to catch criminals, he points out in his book. When it operates as a political police "it is an affront to the basic rights of free speech and association and an insult to the letter and the spirit of the Constitution."

From all this and more, as my study continues, it seems **clear that the history of the FBI is consistent with the charges that it sought to discredit and "neutralize" Judi Bari and Darryl Cherney, and the environmental cause they were working for, by smearing them publicly with sensational false charges of possession of a bomb, and that it did not hesitate to violate their constitutional rights to achieve its ends.**

My sources for the above include the report of the Church Committee, and the other works cited; in addition, I would point out the following books:

- David J. Garrow, *The FBI And Martin Luther King, Jr.* (1981);
- William Turner, *Hoover's FBI* (1971;
- Joseph Schott, *No Left Turns; The FBI In Peace And War* (1975);
- Don Whitehead, *The FBI Story* (1951);
- Sanford Unger, *FBI* (1975);
- Max Lowenthal, *The FBI* (1950).

I am Professor Emeritus of Political Science, Boston University. I plan to serve *pro bono* in this case. I haven't testified in any case, as expert or otherwise, for several years. Attached is a biographical summary of my academic career and my writings.

---

**B.    Deposition of proposed expert Flint Taylor, Jr., Esquire, June 20, 2001**

On deposition in this action, G. Flint Taylor, Esquire, testified as a proposed expert for

the plaintiffs. (Deposition attached under Tab A.) He has testified as an expert on several

occasions, including before legislative bodies.[1]  When asked to define the parameters of his

expert testimony, he responded that he was not "being asked to evaluate the specifics of the Earth

First! case" (Deposition at 19). In elaborating on the scope of his proposed testimony, Mr.

Taylor included the basis for his opinion, at 21-24:

7

A. Okay. Well, my understanding of the scope, to elaborate on what Dennis has written here in this document you've shown me, is to talk about the interrelationship, as I know it from the Hampton case and secondarily from the Greensboro case and the other cases that I studied and dealt with in terms of documentary and other evidence that related to those two cases, to deal with the inter-relationship between the FBI and the local police, the interrelationships that arise from the FBI's use of informants and informant provocateurs, the interrelationships that arise in and result in obtaining -- then state law enforcement people, police, obtaining search warrants, arrest warrants... -- for political persons or organizations as the result of what FBI agents and informants, the information that they have obtained; also prosecutions that are either instigated by or manipulated by the FBI through local law enforcement agencies and law enforcement prosecutors, that kind of thing.

Q. What's the basis of your knowledge of these subjects?

A. The basis of my knowledge is a 13-year involvement in the Hampton case and mean[t] dealing with perhaps a hundred depositions of law enforcement officials, an 18-month trial where testimony was taken from those various law enforcement agents going all the way to, I believe, the deputy director of the FBI for intelligence operations, Sullivan; I think we did him.

Q. By deposition?

A. Yes. And, you know, dealing with the transcript which was 37,000 pages, dealing with 200 volumes of FBI documents in that case, writing a 250-page appeal in that case, dealing with the Senate Select Committee on Intelligence, the Church committee dealing with Art Jefferson over there, and working with him and sharing evidence that we developed along with the evidence developed by them, and the conclusions that he and his committee drew along with the conclusions and findings that we found in our case. Also going -- when the FBI, pursuant to an FOIA that was brought, going to Washington and reviewing all of the COINTELPRO documents that were made available pursuant -- I think that was sometime in the late '70 -- pursuant to the FOIA... And reading the Church committee report and various other reports that were generated... seven or eight of them at that time, companion reports that were done with regard to the FBI, the CIA, and Dr. King. *** And consulting with other lawyers in other related cases like Geronimo Pratt's case, like Dhoruba's case in New York, helping out a little bit on those cases and becoming familiar with the evidence in those cases. I'm sure there's more...

Mr. Taylor offered his opinion at 30-32:

Well, generally speaking, **my opinions are that the FBI, through COINTELPRO and various other programs that they came before and have come after, had a -- were in essence the political police when it came to dealing with dissenters groups, particularly in the '60s and early '70s in dealing with the Black Panther Party, and that they had certain techniques and methodology they used which were illegal and**

---

[1] Deposition testimony at 10-12.

LAW OFFICE OF
DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

unconstitutional and at times violent and deadly, and that those techniques included and were part and parcel of cooperation and manipulation of, on the one hand, informants and provocateurs, and on the other hand of local law enforcement, particularly local police. And that they -- this was manifested in an extreme way in their dealing with the black liberation movement in general and the Black Panthers in specific and that you can trace it from Malcolm X and Martin Luther King through Fred Hampton and that you see the same kind of markers in the various cases that have to do with, number one, the development of information, both accurate and misinformation, through informants that is supplied to local police to do their bidding, in other words to -- and in the case of the Hampton case and in the case of -- across the country during that period of time -- in LA there was a similar situation on December 8th, which was four days later -- that there were several others across the country where the FBI developed information pursuant to their COINTELPRO program, through informants, and that they either manipulated or in cooperation with the state police got the police to actually do the raids. People were injured and killed. People were arrested. People were prosecuted. That warrants were obtained based on information that the FBI supplied, but then covered one way or another that they supplied information that was not accurate in order to support the obtaining of a search warrant or arrest warrant to make an arrest. And that their information also led to prosecutions pursuant to the COINTELPRO program and that the -- that one of the bellwethers of the COINTELPRO program was to attempt to get local law enforcement to arrest dissenters and people who were targeted by the FBI on all conceivable charges and try to falsely prosecute them for those charges. And then another aspect of their program was to defame or to try to put in the worst public light these organizations and these leaders and also to try to provoke them into criminal activities through the use of informants.

C.   *Select Committee to Study Governmental Operations with Respect to Intelligence Activities,* Church Report:
       *--Introduction and Summary*
       *--Major Finding*
       *--Conclusions and Recommendations*
       --COINTELPRO:  The FBI's Covert Action Programs
            Against American Citizens

**COINTELPRO.** The Senate's 1976 Report by the *Select Committee To Study Governmental Operations With Respect To Intelligence Activities*[2] was published after a staff study of more than 20,000 pages of Bureau documents, depositions of many of the

---

[2]  *Select Committee To Study Governmental Operations With Respect To Intelligence Activities,* United States Senate; Together with Additional, Supplemental, and Separate Views, April 26, 1976; *Intelligence Activities and the Rights of Americans,* Book II, Final Report ("Church Report, *Introduction and Summary*").

9

1  Bureau agents involved in the programs, interviews of several COINTELPRO agents, as

2  well as extensive hearings by the Committee Chaired by Senator Frank Church. It

3  provides decades of COINTELPRO history. Its *Introduction and Summary* summarizes

4  "forty years" of unlawful activities by the FBI targeting "a wide array of citizens

5  engaging in lawful activity" and "violat[ions of] the rights of lawful assembly and

6  political expression."[3] The Report relates the purpose of the FBI's abuses of its power:

7  "The FBI's COINTELPRO - counterintelligence program - was designed to 'disrupt'

8  groups and 'neutralize' individuals deemed to be threats to domestic security."[4]

10  **First Amendment violations.** Under the *Major Findings* section of its discussion of

11  *Using Covert Action to Disrupt and Discredit Domestic Groups,*[5] the Report relates that "[t]he

12  Committee finds that covert action programs have been used to disrupt the lawful political

13  activities of individual Americans and groups and to discredit them, using dangerous and

14  degrading tactics...."[6] The Senate condemned the covert COINTELPRO activities targeting

15  those "advocating political ideas or engaging in lawful political activities... [whose] purpose [is

---

[3]  *Introduction and Summary* at 2.

[4]  Id. at 9.

[5]  *Select Committee To Study Governmental Operations With Respect To Intelligence Activities,* United States Senate; Together with Additional, Supplemental, and Separate Views, April, 1976; Book II, Final Report, Using Covert Action to Disrupt and Discredit domestic Groups ("Church Report, *Major Finding*.")

[6]  Id. at 2.

10

1  to] petition the government for redress of grievances or other such constitutionally protected

2  purpose."[7]

3
4
5
6
> "[V]igorous expression of unpopular views, association with dissenting groups, participation in peaceful protest activities, have provoked both government surveillance and retaliation.... The FBI should be prohibited from... [i]nterfering with lawful speech, publication, assembly, organizational activity, or association of Americans."[8]

7  The 1976 Senate Committee's Report bluntly states, "the FBI was not just 'chilling' free

8  speech, but squarely attacking it. The tactics used against Americans often risked and sometimes

9  caused serious emotional, economic, or physical damage."[9] (emphasis supplied)

10  The Senate elaborated:

11
12
13
> The acts taken interfered with the First Amendment rights of citizens. They were explicitly intended to deter citizens from joining groups, "neutralize" those who were already members, and prevent or inhibit the expression of ideas.

14  **Media.** Furthermore, the Senate's Report recognized the FBI's "covert" "media

15  manipulation" "to influence the public's perception of persons and organizations by

16  _____

17  [7]

18  *Select Committee To Study Governmental Operations With Respect To Intelligence Activities,* United States Senate; Together with Additional, Supplemental, and Separate Views, April 26 (Legislative Day, April 14), 1976; Book II, Final Report, *IV. Conclusions and Recommendations* ("Church Report, *Conclusions and Recommendations"),* at 30.

19
20

21  See also id. at 30: In no event should the FBI open a preliminary or full preventive intelligence investigation based upon information that an American is advocating political ideas or engaging in lawful political activities or is associating with others for the purpose of petitioning the government for redress of grievances or other such constitutionally protected purpose.

22
23

24  [8]  Id. at 4.

25  [9]  Church Report, *Major Finding* at 4. See also id. at 4: The acts taken interfered

26  with the First Amendment rights of citizens. They were explicitly intended to deter citizens from joining groups, "neutralize" those who were already members, and prevent

27  or inhibit the expression of ideas... Instructions to "preclude" free speech... occurred in every program. In the New Left program, for instance, approximately thirty-nine percent

28  of all actions attempted to keep targets from speaking, teaching, writing, or publishing.

11

disseminating derogatory information to the press, either anonymously or through 'friendly' news

contacts,"[10] documenting "express attempt[s] to interfere" with First Amendment rights[11] -- as in

this case before this Court.

*Lawlessness.* The Committee found that FBI's tactics involved not just "lawlessness" –

but that under "COINTELPRO... the Constitution [was] 'not [given] a thought' under the FBI's

policies."[12] "[I]n COINTELPRO," the Senate reported, "the Bureau imposed summary

punishment, not only on the allegedly violent, but also on the nonviolent advocates of change...

Some victims did nothing more than associate with targets."[13] The Senate concluded[14] that "the

failures to obey the law and, in the words of the oath of office, to 'preserve, protect, and defend'

the Constitution, have occurred repeatedly throughout administrations of both political parties

going back four decades."[15]

*Informants.* The Committee Report documents the use of informants "against peaceful,

law abiding groups," informants who, "[t]o maintain their credentials... have involved

---

[10] Id. See also id. at 14: (b) Media Manipulation. The FBI has attempted covertly
to influence the public's perception of persons and organizations by disseminating
derogatory information to the press, either anonymously or through "friendly" news
contacts. The impact of those articles is generally difficult to measure, although in some
cases there are fairly direct connections to injury to the target. The Bureau also attempted
to influence media reporting which would have any impact on the public image...

[11] Id. at 16.

[12] Id. at 2.

[13] Id. at 3.

[14] Church Report, *Conclusions and Recommendations.*

[15] Id. at 2.

12

themselves in violent activity."[16]  This circumstance was present in the FBI's years-long

THERMCON case designed to entrap a former Arizona Earth Firster – Earth First! founder Dave

Foreman.  That effort culminated in an endeavor to down power lines in 1989.

   ***Martin Luther King, Jr.***  Using the FBI's targeting of Dr. King as one blatant example of

illegal COINTELPRO activity, the Report relates that "many of the victims were concededly

nonviolent... and posed no threat to the national security."[17]

   ***Church Report's Supplementary Detailed Staff Report:  The FBI's Covert Action***

***Programs Against American Citizens.***  The facts in the Report cited above are in large part a

distillation of the Committee's *Supplementary Detailed Staff Reports.*  One such supplementary

report details instances of illegality – *COINTELPRO:  The FBI's Covert Action Programs*

*Against American Citizens.*  It too is part of plaintiffs' proffer, under Tab B.  *All of these*

*techniques* in the case now before the Court are exemplified in this scholarly work:

   (1)    "Counterintelligence" was a misnomer for domestic covert action;

   (2)    Its purpose was to maintain the existing social and political order;

   (3)    Its techniques carried a serious risk of physical, emotional and economic
          damage;

   (4)    Legal restrictions were ignored;

   (5)    Its goals were to prevent or disrupt the exercise of First Amendment rights
          by:

          (a)    Propaganda by the use of "friendly" media;

          (b)    The reprinting of bogus mailings, pamphlets and fliers, many of
                 which were anonymous;

---

[16]    Church Report, *Introduction and Summary* at 12.

[17]    Church Report, *Major Finding* at 2.

13

1     (6)    The illicit use of informants;

2     (7)    The creation and use of fictitious organizations;

3     (8)    The use of hostile third parties against targeted groups;

4     (9)    Disseminating derogatory information to friends, family, associates and
5             employers; and

6     (10)   Interference with and abuse of the judicial process.

7     See also other *Supplementary Detailed Staff Reports:*

8             ●      The FBI's Covert Action Program
9                    to Destroy the Black Panther Party
              ●      Dr. Martin Luther King, Jr., Case Study
10            ●      National Security, Civil Liberties, and the
                     Collection of Intelligence:  A Report On
11                   The Huston Plan

12    **D.     Senator Edmond Muskie's denouncement of FBI's**
13            **COINTELPRO activities on Earth Day 1970**

14         On April 22, 1970, as 22 million Americans rallied across the country on the first Earth

15    Day celebration, FBI agents in over 40 cities were ordered to spy on and infiltrate these events.

16    Their malign surveillance of Earth Day, 1970, was censured by no less an Establishment

17    personage than U.S. Senator Edmund Muskie, then a prominent presidential hopeful.  Muskie

18    had spoken at the 1970 Philadelphia Earth Day event and  – from the floor of the Senate –

19    concluded that the FBI's treatment of the movement's exercise of First Amendment rights

20    presented "a dangerous threat to fundamental constitutional rights."

21         The power of the environmental movement and the challenge it posed to business-as-

22    usual made it an instant target for FBI suppression.  Thus, the repressive attentions of the FBI

23    embodied in COINTELPRO operations were turned to the environmental protection movement –

24    almost as soon as it arose.

25         Plaintiffs allege that the FBI similarly violated their rights guaranteed under the First

14

1  Amendment – under strikingly similar circumstances as related by Senator Muskie: "[A]

2  dangerous threat to fundamental constitutional rights" of environmental activists.

3      **E.      COINTELPRO targeting of Geronimo ji jaga (Pratt)**

4      Pratt, a former Black Panther leader, was wrongfully convicted for the murder of a

5  woman in Santa Monica, California. Throughout his 27 years in prison, Geronimo always

6  maintained that he was 400 miles away in Oakland, California, at the time of the killing, and that

7  he was a victim of a FBI COINTELPRO action carried out by a number of FBI agents –

8  including Richard W. Held, then a member of the "Racial Matters" squad in the FBI's Los

9  Angeles field office. Recently, Mr. Held was the Special Agent-in-Charge of the San Francisco

10  field office at the time of the bombing in 1990 and thereafter, and he was formerly the lead and

11  chief defendant in this case.

12

13      Pratt had been convicted of committing an armed robbery of $18 in Santa Monica in

14  which a young schoolteacher was killed. Prosecutors won the case in court, largely on the

15  testimony of an acquaintance who said that Pratt had confessed to the deed. Hidden from the

16  defense and jury was the background of Pratt's accuser, a police informant. Law enforcement

17  had bailed him out of trouble in the past, and had pointed him at the Panthers. On May 29, 1997,

18  Pratt's conviction and life sentence were vacated, and he was released from prison on June 10,

19  1997.[18]

20

21      In 1998, Pratt filed suit against seven FBI agents, among other defendants, for, *inter alia*,

22  violations of the First, Fourth and Fifth Amendments to the United States Constitution

23

24

25

26  [18]  In Re ELMER GERONIMO PRATT (Habeas Corpus) LA County Superior Court

27  No. A 267020.

28

15

("Compl.").[19] Pratt's suit quotes from several FBI internal memoranda reflecting his being targeted for neutralization by COINTELPRO:

> "...constant consideration is given to the possibility of the utilization of counter-intelligence measures with efforts being directed toward neutralizing PRATT as an effective BPP functionary."[20]

> "...Operation Number One is designed to challenge the legitimacy of the authority exercised by ELMER GERARD PRATT, Deputy Minister of Defense for Southern California."[21]

The use of COINTELPRO techniques pervades Pratt's civil complaint, including the reprinting of bogus pamphlets and fliers, the illegitimate use of informants,[22] the use of hostile third parties against Pratt, dissemination of derogatory information about Pratt, interference with and abuse of the judicial process,[23] the destruction of inculpatory FBI documents,[24] and the use of state law enforcement to do the FBI's bidding.[25]

Prior to the commencement of discovery, in January 2000, the case was settled for $4.5 million.

---

[19]   Elmer G. Pratt v. The City of Los Angeles, et al., Case No. 98-4237.

[20]   Id. ¶ 32.

[21]   Id. ¶ 33.

[22]   Id. ¶¶ 36, 39, 45.

[23]   Id. ¶¶ 40-41, 54.

[24]   Id. ¶ 44.

[25]   Id. ¶¶ 48-49.

16

## F.     COINTELPRO targeting of Frank Wilkinson

Tab C is the February 2, 1983, sworn Declaration of Douglass E. Mirell, Esquire, filed in the case of Frank Wilkinson et al. v. Federal Bureau of Investigation, et al., CD CA, No. 80-01048 – a FOIA case.  That suit eventually yielded over 132,000 documents responsive to his requests for documents reflecting the FBI's targeting of him – triggered simply by his exercise of his First Amendment rights at odds with the status quo – clearly a COINTELPRO operation.

Wilkinson had first attracted the FBI's attention when he secured a staff position on the Los Angeles Housing Authority and sought to integrate a public housing development in the 1940s, whereupon, documents later revealed, the FBI began what turned out to be a decades-long covert surveillance of him.  In the '50s, Wilkinson became a prime mover in the formation of an organization to abolish the House Committee on Un-American Activities (HCUA), heightening the Bureau's interest and surveillance of him – and resulting in the FBI's smearing him as a communist by planted stories appearing in the national press, including the *New York Times*. Wilkinson had been convicted for contempt of Congress for declining to answer, solely on First Amendment grounds, the HCUA's questions about his political affiliations.  Documents filed herewith include a memorandum written less than one month after the Supreme Court's February 27, 1961, decision, rejecting Wilkinson's appeal for contempt of Congress, wherein FBI Director Hoover scrawled a note reading "can't we expedite" his commencement of incarceration – to stop him from his ongoing public appearances.  In the '60s, Wilkinson served as Chairman of the Citizens Committee to Preserve American Freedoms and the National Committee to Abolish Repressive Legislation (NCARL).

Forty-four exhibits are submitted with Mr. Mirell's Declaration filed in Wilkinson's FOIA lawsuit.  The 44 documents in the Declaration are listed as follows:

17

| | | |
|---|---|---|
| 1 | a. | Possible FBI Complicity in Plaintiff Wilkinson's Termination of Employment at Los Angeles Housing Authority – Exhibits 1 through 4.[26] |
| 2 | | |
| 3 | b. | Reports on the United States Supreme Court Actions Concerning Plaintiff Wilkinson [including the revelation that the FBI had a source inside the Supreme Court itself] – Exhibits 5 through 9.[27] |
| 4 | | |
| 5 | c. | Post-Supreme Court Decision Speaking Engagements [reflecting efforts to have public appearances cancelled] – Exhibits 10 through 18.[28] |
| 6 | | |
| 7 | d. | Imprisonment-Related Documents – Exhibits 19 through 23. |
| 8 | e. | Post-1961 Counterintelligence Activities – Exhibits 24 through 38.[29] |
| 9 | f. | Assassination Documents [evidencing that the FBI was contacted by a source to assist in a plan to assassinate Wilkinson] – Exhibits 39 through 41.[30] |
| 10 | | |
| 11 | g. | 1970s Documents – Exhibits 42 through 44. |

---

[26] Declaration at 3: "Exhibit 3 specifically contains a request by FBI Director J. Edgar Hoover that the Los Angeles Field Office consider requesting permission to furnish information regarding Wilkinson to then-governor Earl Warren."

[27] Id. at 3: "In Exhibit 5, a memorandum written less than one month after the [Supreme] Court's February 27, 1961, decision, FBI Director Hoover scrawled a note reading 'can't we expedite that? [commencement of incarceration]'... Exhibit 9 reflects that a copy of the Petition itself was furnished to an unidentified FBI special agent in the Washington Field Office by an unidentified source within the United States Supreme Court itself." (emphasis in original)

[28] Id. at 5: "Exhibits 11 and 12 indicate that University of California at Berkeley President Clark Kerr was 'approached to have permission withdrawn for Wilkinson's appearance on campus....'"

[29] Id. at 5-6: "These exhibits reflect the FBI's continuing intrusion into, disruption of and interference with the work of plaintiff Wilkinson."

[30] Id. at 6: "Though heavily redacted, Exhibits 39 and 40 reflect that the FBI's Los Angeles Field Office was 'contacted by an undisclosed source to assist in an assassination attempt on Frank Wilkinson at a meeting of the American Civil Liberties Union to occur that evening....'"

18

## G.    U.S. House of Representatives Committee on
Government Reform, 2001 – the Boston Informant's Case

In early 2001, the House Committee on Government Reform began an investigation of misconduct by Justice Department personnel in Boston. Evidence indicates that innocent men were permitted to serve decades in prison for crimes they did not commit (some died in prison, one served 30 years, and another served 34 years), government informants committed numerous murders, and murder and drug investigations were ruined in order to protect informants.

THE HOUSE COMMITTEE ON GOVERNMENT REFORM;
February 22, 2002, Verbatim:
*Background Memoranda (Circulated to Members Prior to Hearing)*:

Background:

Joe "The Animal" Barboza became a cooperating government witness in 1967. At the time, he was described to FBI Director J. Edgar Hoover as "a professional assassin responsible for numerous homicides and acknowledged by all professional law enforcement representatives in [New England] to be the most dangerous individual known." Barboza, who was developed as a witness by FBI Special Agents H. Paul Rico and Dennis Condon, provided false testimony to a jury. As a result, a number of men were unfairly convicted of the murder of Edward "Teddy" Deegan. These include Joseph Salvati, who testified before the Committee last year and who served 30 years in prison for a crime he did not commit. Notwithstanding clear evidence in the hands of the FBI that Barboza was lying, local prosecutors sought the death penalty. Two men died in prison, one served 30 years, and another served 34 years.

While the Deegan trial was a terrible miscarriage of justice, it was not an isolated event. What began with complicity between FBI agents and informants to put innocent men in prison evolved into a thirty-year crime wave. Perhaps the most infamous result is that FBI informants Whitey Bulger and Stevie "The Rifleman" Flemmi were permitted to commit numerous murders with impunity, and it appears that some of their murders were committed with federal law enforcement assistance.

The Deegan case is important for a number of reasons:

- Federal law enforcement appears to have known that men were unfairly convicted.

- Federal law enforcement stood by while the death penalty was sought....

- Federal law enforcement may well have been complicit in encouraging Barboza's false testimony.

19

- The real murderers included one, and perhaps two, FBI informants. The Justice Department appears to have been protecting their informants – thereby literally allowing them to get away with murder.

- One of the protected murderers was the brother of infamous FBI informant Stevie "The Rifleman" Flemmi, who was being cultivated as an informant and who went on to commit dozens of murders while being protected by the Justice Department.

After Joe "The Animal" Barboza testified, the Witness Protection Program was created to protect him. He was relocated to Santa Rosa, California. Predictably enough, he soon committed another murder. The first day of hearings will focus on the investigation and Barboza's trial for this murder. The witnesses are all eyewitnesses to what took place. Among other things, the following points will be brought out:

1. The federal government went to extraordinary lengths to help Barboza get away with murder.

2. All three of Thursday's witnesses – each an important federal government official – testified on Barboza's behalf at his trial.

3. Barboza's defense lawyer was provided great assistance by the federal government. The prosecutors were snubbed when they sought help. For example, Santa Rosa investigator Ed Cameron asked FBI Special Agent Dennis Condon for records about Barboza. Condon said he could not provide any records. Both Cameron and Condon will testify.

4. The murder weapon was given to the FBI for analysis. It was lost for a period of time.

5. When investigator Ed Cameron flew out to Boston to talk to Justice Department officials, the climate was so hostile he stored his papers in a hotel safe. He later came to believe that someone broke into his room to search his briefcase.

6. At one point in Barboza's trial, either H. Paul Rico or Dennis Condon (Marteen Miller cannot remember which) offered to lie to help the defense. The defense lawyer believed the testimony would be untrue and refused to allow the FBI agent to commit perjury. (In another important case a few years later, the Supreme Court of Rhode Island made an official finding that H. Paul Rico coerced another famous government cooperating witness to lie under oath, and that Rico himself committed perjury.) Barboza's defense lawyer, Marteen Miller, told us that he remembers thinking at the time "is this the stuff the FBI gets away with?"

20

7. Barboza ultimately pled guilty to the Wilson murder. He got a short sentence and federal prosecutor Harrington testified at his parole hearing a few years later. When asked about the short prison term for Barboza, his own lawyer told us: "That was pretty amazing. I figured out that was how it worked when you had friends in the FBI."

8. Tapes were made of Barboza's conversations when he was in jail in Santa Rosa. These tapes, which helped solve at least one additional homicide, were given to the FBI. The FBI either lost these tapes or will not provide them to the Committee.

Evidence obtained by the Committee shows that federal law enforcement obstructed the California murder investigation....

Three years before the California murder prosecution of Joe "The Animal" Barboza, Rico, Condon and Harrington were the key figures in developing Barboza as a witness. All three had access to information that shows clearly that the wrong men were being prosecuted for the Deegan murder. As important, the written records provided to the Committee show that Rico, Condon and Harrington did not care that Barboza was attempting to send the wrong men to the electric chair. For example, the FBI had illegal microphone surveillance of a building and caught, on tape, Barboza and his friend asking mafia boss Raymond Patriarca for permission to kill Teddy Deegan. This was three days before Deegan was killed on March 12, 1965. The information was important enough to send to FBI Director Hoover:

(Redacted) advised on 3/9/65 that James Flemmi and Joseph Barboza contacted Patriarca, and they explained that they are having a problem with Teddy Deegan and desired to get the "OK" to kill him. Flemmi stated that Deegan is an arrogant, nasty sneak and should be killed.

Two days before this memo was sent to the FBI Director, and two days before Deegan was killed, H. Paul Rico wrote a memo that indicated that Flemmi had been given permission to kill Deegan. The day after the murder, Rico wrote a memo stating that he had been told who killed Deegan. The memo indicates that Jimmy Flemmi committed the murder.

Nothing was done to prosecute anyone for the Deegan murder for over two years. However, Joe "The Animal" Barboza was later arrested and faced a long prison sentence for an unrelated offense. Special Agents Rico and Condon worked with Barboza for months and he came up with testimony that would implicate others in the murder of Deegan. Significantly, Barboza told both Rico and Condon that "he would never provide information that would allow James Vincent Flemmi to 'fry'[.]" The documents indicate that Rico and Condon never followed up on this statement – they literally allowed Flemmi to get away with murder, they allowed Barboza to commit perjury, and all exculpatory information was covered up for decades. It is important to note that Flemmi is the brother of Stevie "The Rifleman" Flemmi, who went on to commit numerous homicides, some of which appear to have been committed with the assistance of federal law enforcement personnel.

21

H. Paul Rico was also involved in encouraging another witness to commit perjury in another important Mafia trial. After he left the FBI, Rico became the Director of Security for World Jai Alai, a company that had connections to organized crime, and that was tied to Stevie Flemmi and Whitey Bulger. Rico is currently under investigation for the murder of successful Tulsa businessman Roger Wheeler in 1981. The federal government's possible role in obstructing this investigation will be the subject of later hearings. At present, the Justice Department has refused to provide the Committee documents that are relevant to this subject.

## H.    CISPES (Committee In Solidarity with the People of El Salvador)

The FBI continued to violate the constitutional rights of citizens through the 1980s, up to at least 1990, as authoritatively described by Ross Gelbspan in his 1991 book *Break-Ins, Death Threats And The FBI*.[31] Gelbspan utilized thousands of pages of FBI documents secured through the Freedom of Information Act, and found that activists who opposed U.S. policy in Central America "experienced nearly 200 incidents of harassment and intimidation, many involving... break-ins and thefts or rifling of files."[32]

> [In] piecing together scores of confirmed reports of both official harassments and secret, mysterious violations, there emerges the unmistakable picture of deliberate, coordinated and extended campaign of political rape, in which the homes and workplaces of political activists have been invaded, their belongings stolen or trashed and their sense of security deeply violated.[33]

Break-ins, harassment, death-threats, and arson all targeting CISPES members remain unsolved as the FBI refused to investigate any of these crimes. "Of the nearly 200 political break-ins and thefts of files reported by Central America & Sanctuary Activists not one has been solved."[34]

---

[31]    R. Gelbspan, *Break-Ins, Death Threats And The FBI*, South End Press (1991).

[32]    Id.

[33]    Id. at 24.

[34]    Id. at 23.

22

1    In the late 1970s, El Salvador was in social and political upheaval. In the 1980s, the

2    civil war was raging, and the U.S. Government considered El Salvador strategically valuable in

3    regards to Nicaragua.

4    The U.S. Administration enlisted in a campaign against domestic political opponents the

5    aid of conservative groups including the *Western Goals Foundation, Council for Inter-American*

6    *Security*, *Students for a Better America*, and *Young Americans Foundation*, as well as the

7    Reverend Sun Myung Moon.[35] These groups often put out publications that contained wholly

8    unfounded allegations, character assassinations, and red baiting. The FBI repeatedly used the

9    information in these publications as guise to "open files on groups and individuals."[36] Examples

10   of such pamphlets were found in the John Birch Society's *Replica* and *Review of the News*, as

11   well as in the *Bulletin of the World Anti-Communist League*, an international press service.

12   These publications were collected and disseminated by the Office of Latin American Public

13   Diplomacy – an obscure division of the State Department, which was in fact a covert CIA-

14   conceived domestic disinformation propaganda tool designed to promote the Administration's

15   Central America policies.[37]

16   The Chairman of John Birch Society (U.S. Representative from Georgia) Larry

17   McDonald founded the *Western Goals Foundation* in 1979 with his partner John Rees – a paid

18   FBI informant, right-wing journalist and police consultant to law enforcement in Newark,

19   Chicago, and Washington, D.C. McDonald and Rees' "agenda [included] creat[ing] the largest

---

[35]    Id. at 20.

[36]    Id. at 23.

[37]    Id. at 22.

23

private U.S. database of subversives in the U.S. in order to help the intelligence community root out domestic terrorists and augment the power of the FBI."[38]

In "March 1981, [the] FBI won approval from the Justice Department to launch investigation into CISPES on grounds it was representing a hostile power—the Salvadoran FMLN rebels – and, as such, had violated the Foreign Agents Registration Act."[39] This was the beginning of the first official probe into CISPES. Eight years later, in 1989, the U.S. Senate's Select Committee on Intelligence would observe that this first probe was based on knowingly suspect information contained in the Handal[40] papers.[41]

A three-day conference of the FBI's top counterintelligence and counter-terrorism operatives, held at the FBI's Quantico, Virginia, facility, pooled information about the growing "terrorist threat" – leading to the second major probe into CISPES. And where the initial FARA probe was limited to 12 FBI offices around the country, this new, expanded investigation would, in short order, involve all 59 field offices of the FBI.[42]

---

[38] Id.

[39] Id. at 46.

[40] Documents said to have been compiled by Shafik Handal – head of the small Salvadoran Communist Party – including a report entitled *The Moscow Plan for Latin America*, purporting to be a long-term strategy inspired by Moscow to work through Havana for the spread of communism throughout Central America.

[41] The FBI and CISPES, Report of the Select Committee on Intelligence, United States Senate, Washington, D.C., Feb. 23, 1988.

[42] FBI Headquarters CISPES File document: 199-8848-105, Oct. 28, 1983.

24

DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

private U.S. database of subversives in the U.S. in order to help the intelligence community root out domestic terrorists and augment the power of the FBI."[38]

In "March 1981, [the] FBI won approval from the Justice Department to launch investigation into CISPES on grounds it was representing a hostile power—the Salvadoran FMLN rebels – and, as such, had violated the Foreign Agents Registration Act."[39] This was the beginning of the first official probe into CISPES. Eight years later, in 1989, the U.S. Senate's Select Committee on Intelligence would observe that this first probe was based on knowingly suspect information contained in the Handal[40] papers.[41]

A three-day conference of the FBI's top counterintelligence and counter-terrorism operatives, held at the FBI's Quantico, Virginia, facility, pooled information about the growing "terrorist threat" – leading to the second major probe into CISPES. And where the initial FARA probe was limited to 12 FBI offices around the country, this new, expanded investigation would, in short order, involve all 59 field offices of the FBI.[42]

---

[38] Id.

[39] Id. at 46.

[40] Documents said to have been compiled by Shafik Handal – head of the small Salvadoran Communist Party – including a report entitled *The Moscow Plan for Latin America*, purporting to be a long-term strategy inspired by Moscow to work through Havana for the spread of communism throughout Central America.

[41] The FBI and CISPES, Report of the Select Committee on Intelligence, United States Senate, Washington, D.C., Feb. 23, 1988.

[42] FBI Headquarters CISPES File document: 199-8848-105, Oct. 28, 1983.

24

DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

Regarding the second major CISPES probe, "the Senate report concluded that during his 1983 visit to Washington, 'Mr. Varelli's [informant] report indicates that he never actually met any Washington members of CISPES or attended any of their meetings...."[43]

On November 7, 1983, a bomb destroyed the Mansfield Room of the U.S. Senate Chambers. The bombing of the Capitol provided the Bureau with an extraordinary pretext for a massive intensification of the probe of left wing and liberal groups[44] – despite the Bureau's almost immediate identification of the bombing suspects.[45] Any concrete link between the bombers and the network of highly visible Central America political groups would:

> ...completely vindicate all the FBI's investigations of groups opposed to the Reagan Administration policies in Central America. Such a connection would prove that groups like CISPES... [are] part of a larger terror network with links to international terrorists. Such a break would generate the public revulsion needed to put a stop to the organizations polluting the public discussion of U.S. policies in Central America.[46]

There were also findings in federal court revealing illegal activities of the Bureau. U.S. District Executive Magistrate Judge Joan H. Lefkow ruled in February 1991 (on a case involving Chicago-based Central America groups) that the FBI used infiltrators to penetrate the leadership of several groups. The court found:

> [The FBI] obtained copies of bank deposit slips, canceled checks, and signature cards for CISPES memberships, as well as copies of the groups' long-distance telephone records to determine the identity of Chicago CISPES memberships and contacts... [and authorized] the FBI [to conduct] a photographic surveillance... of one of Chicago's CISPES leaders and on April 8, 1985, submitted his photograph and background data for inclusion in the Terrorist photograph album. Then in a

---

[43] The FBI and CISPES, Report of the Select Committee on Intelligence, United States Senate, July 14, 1989, pg 75.

[44] Id. at 135.

[45] Id. at 138.

[46] Id. at 136.

25

sworn statement made on April 8, 1988 (three years after the original submission), the FBI case agent for the Chicago CISPES investigation, who submitted the photograph and data, admitted that he did not believe that his investigation established Chicago's CISPES leader to be a terrorist.... The FBI has not shown that there is no reasonable expectation of recurrence against either the named petitioners or others...although the FBI has enacted new guidelines, they have also enacted guidelines in the past which were meant to prevent this type of investigation... the FBI's own regulations are, therefore, not sufficient to prevent violations. The regulations can also be repealed or modified in the future and do not, therefore, guarantee future compliance.... Based on the FBI's past behavior, there is a reasonable likelihood of repetition.[47]

## I.    Birmingham Bombing Case

In 1963, a dynamite bomb blast in a black church in Birmingham, Alabama, killed four young girls. But it was not until May 2001 that Ku Klux Klansman Thomas Blanton was found guilty of the crime. A second suspect, Bobby Frank Cherry, is being tried now. Why the delay? Because the FBI held back evidence that would have convicted these accomplices decades ago. The Alabama state attorney general's office carried out an investigation of the murders, but required assistance from the FBI – which had identified four or possibly five perpetrators when the bombing occurred. The FBI did not cooperate until threatened by a reporter. Then, piecing together federal and state evidence, the attorney general was able to send one bomber, Robert Chambliss, to prison in 1977; the others remained at large.

It was not until 1997, when a U.S. attorney in Birmingham reopened the investigation, that the two other suspects were indicted – and it was discovered that the FBI had tape recordings that incriminated them both. The smoking gun evidence was hidden in the Bureau's files for decades. A fourth suspect, Herman Cash, died in 1994 without being charged.

Apparently, an FBI memorandum of May 1965 addressed to J. Edgar Hoover names the four suspects. Saying the chances for conviction were "remote," Mr. Hoover ordered FBI agents

---

[47]    Report of Executive Magistrate Joan Humphrey Lefkow to the Honorable Ann C. Williams, U.S. District Court, Chicago, Feb. 4, 1991.

26

1   not to meet with state or federal prosecutors and not to share their findings. Hoover then closed

2   the case. For years, Blanton, Cherry, and Cash evaded indictment and prosecution because the

3   FBI held back these recordings.

4       Bill Baxley, the Alabama Attorney General who prosecuted Chambliss in the '70s, was

5   stunned by the revelation of the tapes after so many years and wondered how this evidence could

6   have been hidden and the investigation derailed. In a scathing Op-Ed piece published in *The*

7   *New York Times* May 3, 2001 (Tab D), Baxley wrote:

8           This was evidence we desperately needed in 1977— evidence whose existence
9           FBI officials had denied. Had it been provided in 1977, we could have convicted
            all three of these Klansmen... How can the FBI justify this to the families of four
10          precious girls?

11      The 16th Street Baptist Church, where the bombing occurred, had been the headquarters

12   for the historic civil rights marches led by the Rev. Martin Luther King, Jr.

13   **J.    Richard Jewell**

14   ***Fraudulent attempts to obtain waiver of Fifth Amendment rights.***   In 1998, Richard

15   Jewell's mother, Barbara, filed a <u>Bivens</u>-type lawsuit[48] against the United States, FBI Agents Diader

16   Rosario, Donald Johnson, and Joseph F. Fierro, as well as "Unknown Agents\Employees of the U.S.

17   Federal Bureau of Investigation" and the U.S. Department of Justice.[49]  Ms. Jewell's First Amended

18   Complaint ("Compl.") recites the facts of defendant FBI Agents attempting to obtain her

19   son Richard Jewell's waiver of his <u>Miranda</u> rights – fraudulently and with the participation of other

---

[48]    Amended Complaint ("Compl.") ¶ 13: "This Court has original subject matter
        jurisdiction over Plaintiff's Constitutional tort claims in this action pursuant to 28 U.S.C. §
        1331(a), <u>Bivens v. Six Unknown Agents of the Fed. Bur. of Narcotics</u>, 403 U.S. 388, 91
        S.Ct. 1999 (1971), and its progeny."

[49]    <u>Jewell v. U.S. et al.</u>, USDC N.D. GA, No. 1-98-CV-2140.

27

1 | FBI and DOJ personnel.[50] Compl. ¶ 59-60:

2 |     At approximately 5:00 p.m. on July 30, 1996, FBI Defendants Rosario and
3 | Johnson met Mr. Jewell at Plaintiff's home and requested that he accompany them
    to FBI Atlanta Headquarters for a formal interview which would be videotaped to
4 |     assist the FBI with a making of a "training film" concerning "first responders" to
    crime scenes.
5 |
6 | FBI Defendants Rosario and Johnson told Mr. Jewell that he was not a suspect.

7 | After FBI Director Freeh ordered that Jewell be "Mirandized," FBI Defendant Johnson

8 | then made the following statement to Mr. Jewell:

9 |     Now we get to the part where we're, we're pretty much finished with all the
    background, but I want to deal uh, this, I told you would be basically two-fold
10 |     here. We're gonna use it for the purposes I told you before, but in order to do so, I
    want to go through it just like it's [a] real official interview. Okay? So what I'm
11 |     gonna do is I'm gonna... walk up and introduce myself to you, basically, tell you
    who I am, show you my credentials, just like we're doing a professional interview,
12 |     Okay? And then I'll just ask you a couple of questions like your name and your
13 |     age, and... I'm even gonna go as far as to advise you of your rights.

14 | The ruse continued. Compl. ¶¶ 71-72:

15 |     At 6:12 p.m. FBI Defendants Johnson and Rosario returned to the conference
16 |     room and the interview continued. On the videotape FBI Defendant Johnson
    appeared and stood in front of Mr. Jewell with his FBI credentials in hand. FBI
17 |     Defendant Johnson then made the following statement:

18 |     Mr. Jewell my name is Donald Johnson, I am a Special Agent with the
    FBI and the reason I am here today is we are doing basically an interview
19 |     of all individuals that were at the Centennial Park when an explosion took
20 |     off.

21 | FBI Defendant Johnson then presented Mr. Jewell with an FBI "395," a legal form which

22 | when signed waives one's Miranda rights.

23 |

24 |

25 | [50]     Compl. ¶ 64: "The July 30, 1996, interrogation of Mr. Jewell was conducted by
    FBI Defendants Rosario and Johnson with the assistance of FBI Supervisory Agents, U.S.
26 |     Attorney for the Northern District of Georgia, and Unknown Agents\Employees of the FBI
    and DOJ in Atlanta and Washington, D.C. who monitored the interrogation, provided
27 |     questions, and advice regarding deception strategy and 'Mirandizing' Mr. Jewell."

28 |

LAW OFFICE OF
DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

1      ***Fraudulent Affidavit in Support of Search Warrant.***[51] As in this case, FBI agents

2 knowingly provided false information to a neutral judicial officer, and withheld exculpatory

3 evidence in their signed Affidavits in support of search warrants.[52] These knowingly false

4 allegations "combined to mislead the magistrate judge and undermine her finding of probable

5

6 cause." Id. ¶ 89.

7      Material false allegations and material omissions in the Agent's Affidavit in support of

8 the search warrant include:

9      •     "Paragraphs 6 and 9 of the Search Warrant Affidavit are materially false
        and misleading because they suggest Mr. Jewell made the 911 call by stating that

10         'at approximately the same time that the 911 call was being received' Mr. Jewell
        was 'in close proximity' to the phone from which the 911 call originated;" Id. ¶

11         83.

12

13      •     "The Search Warrant Affidavit is materially false and misleading because
        the Defendants intentionally or recklessly omitted the material fact that Mr. Jewell

14         could not and did not make the 911 Call." Id. ¶ 83. Id. ¶ 84:

15              By the evening of July 30, 1996, more than 3½ days after the Bombing,
             the FBI Defendants knew Mr. Jewell did not make the 911 call because

16              they knew (i) the exact location of the Bombing, (ii) the exact location
             from which the 911 call was placed, (iii) the exact time the 911 call was

17              made, i.e. 12:58 a.m. on July 27,1996, and (iv) that at 12:57 a.m. and

18 ─────────────────

19 [51]   Id. ¶ 64: On the evening of July 30, 1996, FBI Defendants Johnson, Rosario, and
     Fierro, and Unknown Agents\Employees of the FBI and DOJ including without limitation

20      Unknown FBI Principal Legal Advisors and Assistant U.S. Attorneys (collectively the
     "FBI Defendants") prepared that certain "AFFIDAVIT IN SUPPORT OF SEARCH

21      WARRANT" and that certain "SUPPLEMENT TO AFFIDAVITS IN SUPPORT OF
     SEARCH WARRANTS" (respectively the "Search Warrant Affidavit" and the "Search

22      Warrant Affidavit Supplement").

23 [52]   Id. ¶¶ 79-80: "At 11:42 p.m. on July 30, 1996 United States Magistrate Judge,

24      Gerrilyn G. Brill issued 'Search Warrant re: Apt F-3, 3649 Buford Hwy, Atlanta,
     Georgia,' authorizing a search of the home of Plaintiff and Mr. Jewell and the seizure of

25      property located there (the 'Search Warrant')."

26      "The Search Warrant was issued based upon the Search Warrant Affidavit and the

27      Supplement to the Search Warrant Affidavit which were sworn to under oath by FBI
     Defendant "Special Agent Diader Rosario."

28

LAW OFFICE OF
DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

1           12:58 a.m., the time Officer Tom Davis called the Centennial Olympic
Park Explosive Ordinance Detail, Mr. Jewell was standing next to Officer

2           Davis and the Bomb.

3

4 • "Paragraph 15 of the Search Warrant Affidavit is materially false and
misleading because ***[53] did not advise the FBI on July 27, 1996 (the day of the
Bombing) that he and his wife watched Richard Jewell on television being

5           interviewed about the Bombing, and neither *** nor his wife had concerns about
Mr. Jewell's 'stability.'" Id. ¶ 92;

6

7 • Paragraph 15 of the Search Warrant Affidavit is materially false and misleading
because the Defendants intentionally or recklessly omitted exculpatory

8           information about Mr. Jewell..." Id. ¶ 99;

9 • "The repeated false description of Mr. Jewell as a campus 'security' officer
and the omission of the fact that Mr. Jewell was a State of Georgia certified 'police'

10           officer employed by a legally constituted police department was material to the
magistrate judge's finding probable cause because traffic stops by a security officer

11           are illegal and extraordinary while traffic stops by a police officer are legal and

12           ordinary..." Id. ¶ 107;

13 • The FBI falsely reported in the Affidavit that Mr. Jewell had been fired;[54]

14 • The FBI Affiant falsely reported that he had exceeded his authority in the

15           past;[55]

16

17

18

19 _____

20 [53] *** denotes the name of a deponent in a sealed deposition.

21 [54] Id. ¶ 110: "The inclusion of the false material fact that Mr. Jewell was fired from
his job at HCSO was material to the magistrate judge's finding probable cause because it

22 falsely stated that Mr. Jewell was forced out of a law enforcement position. This false

23 and misleading "fact" made it appear to the magistrate judge that a search of Plaintiff's
home was fair, legitimate, and necessary, and undermined her finding of probable cause."

24 [55] Id. ¶ 113: "The inclusion of the false statement that Mr. Jewell often exceeded his

25 responsibilities as a campus security officer and the omission of the fact that Mr. Jewell
was a State of Georgia certified police officer employed by a legally constituted police

26 department was material to the magistrate judge's finding probable cause because this

27 false and misleading 'fact' made it appear to the magistrate judge that a search of
Plaintiff's home was fair, legitimate, and necessary, and undermined her finding of

28 probable cause."

30

- That he had been subjected to "repeated counseling" and put on "probationary status" by Piedmont College;[56]

- That an FBI interviewee had said that "Jewell might have believed that setting off an explosion in Mr. Jewell's area of responsibility could make him appear heroic and enable him to obtain employment as a police officer..." Id. ¶ 136;

- The FBI lied in the Affidavit about inculpating information that Jewell had been sitting on a bench under which the bomb had exploded;[57]

- That " Jewell [had] terminated [his] interview" with FBI agents;[58] and most significantly

- That Jewell had made "pipe bombs" in the past.[59]

"The Search was conducted in the presence of hundreds of print and television media representatives and broadcast 'live' around the world. During the Search the FBI held a press conference regarding the Bombing Investigation in the immediate vicinity of Plaintiff's home front door and revealed Plaintiff's home address." Id. ¶¶ 164-65.

---

[56] Id. ¶ 114.

[57] Id. ¶ 141: " By the evening of July 30, 1996, more than 3½ days after the Bombing, the FBI Defendants knew 'the bench in question' was not the bench under which the Bomb exploded because they knew (i) the exact location of the Bombing, and (ii) the exact location of all benches around the ATT Tower."

[58] Id. ¶ 152: " FBI Defendants Johnson and Rosario had actual knowledge that the statement 'Richard Jewell terminated the interview' on the evening of July 30, 1996, was false. Mr. Jewell informed FBI Defendants Johnson and Rosario 'that his attorney has instructed him not to answer any more questions' and the interrogation ended. (OPR Report, p. 28, lines 8-10.)"

[59] Id. ¶ 127: "Paragraph 20. of the Search Warrant Affidavit is materially false and misleading because *** did not tell FBI Defendants Johnson and Rosario Mr. Jewell 'had dealt with homemade pipe bombs which had a closed chamber, contained shrapnel, and were set off with blasting caps.' *** does not know anything about 'homemade pipe bombs which had a closed chamber, contained shrapnel, and were set off with blasting caps' or even have such words in his vocabulary."

31

LAW OFFICE OF
DENNIS CUNNINGHAM
SAN FRANCISCO, CA

PLAINTIFFS' OFFER OF PROOF RE FBI MISCONDUCT
No C-91-1057 CW (N D C A )

"The unlawfulness of the actions of each of the FBI Defendants in submitting the false,
misleading and materially incomplete Search Warrant Affidavit and the Search Warrant Affidavit
Supplement was clearly apparent in light of pre-existing law, including <u>Franks v. Delaware</u>, 438
U.S. 154, 98 S.Ct. 2674 (1978), and its progeny..." <u>Id.</u> ¶ 182. So too here.

Thus, a number of circumstances of Jewell's case are also present in the case at bar.
"Wood [Jewell's lawyer] also believes he has a strong case against the FBI agents for
constitutional violations under the Supreme Court's 1971 case <u>Bivens v. Six Unknown Named
Agents of the FBI</u>." *Legal Times,* Nov. 4, 1996, B. Wittes.

## K.   Wen Ho Lee

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
Dr. Lee is an American citizen, born in Taiwan, who worked at Los Alamos National
Laboratory since 1980.  He was involved with maintaining and enhancing computer software
that is used for design of nuclear weapons.

DOE and FBI counterintelligence officers, who focused on Dr. Lee's ethnicity and
work-related travels to PRC (China) and Taiwan, pursued him for years as a possible espionage
agent.  These officers ignored other non-Chinese lab employees with similar technical
backgrounds and travel histories.  Dr. Lee cooperated with his investigators, and endured lie-
detector tests and sting operations by federal officials trying to identify him as the source of leaks
about the W88 weapon system.  These pursuits prompted Robert Vrooman, who was the director
of counterintelligence at Los Alamos, to complain in writing to Senator Domenici about the
blatantly ethnic focus of the FBI's investigation of Dr. Lee.

In early 1999, FBI agents grilled Dr. Lee for hours, telling him that he had failed lie
detector tests (not true), and that he could be electrocuted – like the Rosenbergs in the `50's – if
he did not cooperate and confess to the government about his dealings with China.  Dr. Lee said

32

he could not confess to something he did not do.

Lee was suddenly fired without hearing in March 1999 following a *New York Times* article claiming that Los Alamos was the source of W88 information supposedly lost to the PRC. Shortly after this, it was discovered that he transferred some possibly classified weapons design software in 1993 and 1994 to computers internal to Los Alamos that were not cleared for classified materials. He was also accused of writing some of this software to portable tapes. But there is no evidence that these tapes or the software ever left Los Alamos laboratory. The material on computers was protected by multiple passwords. Dr. Lee's supporters maintain they were created simply as back-ups or to serve as historical archives for these programs. He has stated that the tapes were properly destroyed prior to his dismissal from Los Alamos. For months after his firing, Dr. Lee was subject to 24-hour surveillance by the FBI. He was indicted in December 1999 for violating statutes of the Atomic Energy Act of 1954, statutes pertaining to the mishandling of classified materials with the intent to injure the United States or to secure an advantage for a foreign power. They carry a maximum sentence of life imprisonment. There is no record of any individual ever being prosecuted under these statutes.

Dr. Lee was held in essentially solitary confinement and kept in chains whenever he was out of his cell (1 hour a day for exercise, 1 hour a week to visit his family). This unusually severe incarceration came about because some Laboratory executives provided the astonishing account that Dr. Lee's behavior could directly lead to the nuclear destruction of the United States. Furthermore, FBI agents said Dr. Lee could give signals to an accomplice, and be swept out of the country with the infamous tapes, which he had not destroyed but had hidden somewhere.

The facts that Dr. Lee had always cooperated with his accusers, that he had shown no tendency for flight, and that the tapes were in      his control for six years with no evidence

33

offered that they were compromised were discounted in setting his severe pre-trial detention conditions.

These conditions were maintained for over 200 days, in spite of countless protests from the scientific community, some laboratory employees, concerned citizens, and the community of Chinese and Asian Americans. Upon his release after more than nine months of incarceration, the court, in remarks from the bench, apologized for having been misled by the FBI and DOJ:

> Dr. Lee, I tell you with great sadness that **I feel I was led astray last December by the Executive Branch of government through its Department of Justice, by its Federal Bureau Investigation** and by its United States Attorney for the District of New Mexico, who held the office at that time.
>
> \*     \*     \*
>
> It is only **the top decision makers in the Executive Branch**, especially the Department of Justice and the Department of Energy and locally, during December, who have caused embarrassment by the way this case began and was handled. They did not embarrass me alone. They **have embarrassed our entire nation and each of us who is a citizen of it.**
>
> **I might say that I am also sad and troubled because I do not know the real reasons why the Executive Branch has done all of this.** We will not learn why because the plea agreement shields the Executive Branch from disclosing a lot of information that it was under order to produce that might have supplied the answer.
>
> Although, as I indicated, I have no authority to speak on behalf of the Executive Branch, the President, the Vice-President, the Attorney General, or the Secretary of the Department of Energy, as a member of the Third Branch of the United States Government, the Judiciary, the United States Courts, **I sincerely apologize to you, Dr. Lee, for the unfair manner you were held in custody by the Executive Branch...**

## II.     Arguments for admission of evidence of prior FBI misconduct

### A.     The evidence is admissible to show the FBI's 65-year policy and practice of engaging in similar misconduct – on the issue of unlawful motive

A number of cases have held that evidence of a history of policy and practice is admissible as probative on the issue of unlawful or discriminatory motive. Here, plaintiffs' offer

34

is of proof of a 65-year history of policy and practice – uncharged misconduct evidence of COINTELPRO against United States citizens carried out by numerous instances of violations of the First and Fourth Amendments to the United States Constitution.

The court in NLRB v. S.E. Nichols, Inc., 862 F.2d 952 (2d. Cir. 1988), held that the NLRB had properly "found a *prima facie* case of discriminatory discharge based both on the company's long history of antiunion animus and the company's knowledge of the employees' union activities. In addition to these basic findings, the Board made numerous other findings indicating unlawful motive." Another similarity in that case to the instant case is the abruptness of allegations of wrongful conduct: "The abruptness of a discharge and its timing are persuasive evidence that a company has moved swiftly to eradicate the prime movers of a union drive... All of these facts provide a convincing case of discriminatory discharge." Id.

J.P. Stevens & Co., Inc. v. NLRB, 638 F.2d 676 (4th Cir. 1980) similarly held that the respondent's "unrivaled willingness to violate the law in the past is just as material to the issue of motive as are the disciplinary records of employees relied upon so heavily by the company to justify the disciplinary action it took...." So too here. The FBI's "unrivaled willingness to violate the law in the past is... material to the issue of motive." And see NLRB v. Reed & Prince Mfr. Co., 205 F.2d 131 (1st Cir. 1953), specifically discussing past practice as relevant to the issue of good faith:

> The ultimate issue whether the Company conducted its bargaining negotiations in **good faith** involves a finding of motive or state of mind which can only be inferred from circumstantial evidence. It is similar to the inquiry whether an employer discharged an employee for union activity, or for some other reason, where the prior history of the employer's labor relations, whether good or bad, may be relevant.
> (emphasis supplied)

Good faith is a central issue in the case before this Court.

35

**B.     Prior FBI misconduct is no less relevant to the actions of the individual FBI agents as it would be had the United States remained a defendant**

This Court ruled that plaintiffs could not introduce evidence of COINTELPRO or other misdeeds by the FBI to the extent that plaintiffs could not tie such acts to the individual defendants.

If the United States were a party to the suit, and FBI agents were therefore jointly and severally liable with the United States, prior misconduct could be admissible (subject to the balancing test) under, e.g., policy and practice evidence or Fed. R. Evid. 404(b) (e.g., to contradict defendant's claim of mistake).   In such a case, the evidence would be admissible against both the agent and principal, i.e., the defendant FBI Agents and the United States.

Simply because the substantive law does not allow liability to be imposed on the United States does not vitiate the relevance nor probative value of numerous instances of the FBI's similar *prior and subsequent* misconduct on the issue of the culpability of the individual FBI defendants.  In other words, the substantive law of sovereign immunity does not control this evidentiary issue – to the extent that the uncharged misconduct evidence would be admissible against the individual FBI defendants in a suit including the United States as a defendant, it is still admissible against the individual FBI defendants in a suit excluding the United States as a defendant.

**C.     By his testimony that he acted in good faith and relied on his knowledge of the FBI's good reputation in not questioning FBI-supplied information, Sitterud opened the door to be examined on his knowledge of specific instances of FBI misconduct**

Oakland defendants "opened the door"     to the proffer when defendant Sitterud testified

36

that he had no reason to disbelieve the FBI defendants – based on his good-faith reliance on the FBI's good reputation. A failure of the Court to allow plaintiffs to explore Sitterud's knowledge of the FBI's reputation therefore results in "unfair prejudice" to the plaintiffs. Defendant Sitterud "opened the door" for the introduction of evidence to rebut the "false impression" present in his testimony.[60] "[O]therwise irrelevant evidence can become relevant when other evidence is introduced."[61]

"[A]ny prejudice that results" from rebuttal evidence is the fault of the one who opened the door.[62] Thus, it would be unfair to exclude such evidence relevant to impeach Sitterud's testimony of his good-faith reliance on FBI-supplied information based, according to Sitterud, on his knowledge of the FBI's good reputation.

Fed. R. Evid, 405(a) *Reputation or opinion:*

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. <u>On cross-examination, inquiry is allowable into relevant specific instances of conduct.</u> (emphasis added)

This issue has become central as both Chenault and Sitterud have acknowledged that Marr and Kemnitzer told them that Bari and Cherney were non-violent, yet they purportedly chose to believe the FBI agents' allegations tying plaintiffs to violent terrorist acts.

---

[60]    United States v. Segall, 833 F.2d 144, 148 (9th Cir. 1987). See also United States v. Wales, 977 F.2d 1323, 1326, 9th Cir. 1992, Kosinski, J. concurring ("unfair prejudice" resulting from the introduction of otherwise inadmissible testimony can be removed by introduction of contrary evidence).

[61]    United States v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir. 1989).

[62]    United States v. Bailleaux, 685 F.2d 1105, 1110 (9th Cir. 1982).

37

Thus, plaintiffs should be allowed to introduce evidence to show that Sitterud and

Chenault's alleged good-faith reliance on the FBI was a sham. They knew that the FBI had

"neutralized" political groups in the past.

**D.** **By his testimony that he acted in good faith and relied on his knowledge of the FBI's good reputation in not questioning FBI-supplied information, Sitterud opened the door to character evidence of FBI misconduct**

Such rebuttal of character evidence is proper under the door-opening framework. When a

criminal defendant introduces evidence of his peaceable character during his own testimony, he

has "opened the door" to rebuttal evidence.[63]

Here, OPD defendants have introduced character evidence of their fellow conspirators.

Indeed, the Federal Rules of Evidence themselves provide such a framework. See Fed.

R. Evid. 404[64] and 405, allowing a party to rebut character evidence introduced by the opposing

---

[63]    United States v. Giese, 597 F.2d 1170, 1185 (9th Cir. 1979).

[64]    Rule 404.  Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes

        (a)    Character Evidence Generally.-- Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

               (1)    Character of Accused. -- Evidence of a pertinent trait of character *offered by an accused, or by the prosecution to rebut the same*, or if evidence of a trait of character of the alleged victim of the crime is offered by an accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution;

               (2)    Character of Alleged Victim. -- Evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut the same...

38

side. The OPD has introduced evidence that has made the FBI's character an issue – and plaintiffs should be allowed to answer this evidence in some manner.

### E.  To the extent that FBI defendants' defense is good faith mistake, prior similar misconduct is admissible to show the absence of mistake

Fed. R. Evid. 404(b) *Other Crimes, Wrongs, or Acts* permits the inclusion of uncharged misconduct evidence to show motive, intent, plan, or absence of mistake or accident,[65] and is applicable in civil cases.[66] Thus, prior instances of similar misconduct carried out by other agents acting under the same or related FBI policies, much of which was perpetrated in exactly the same way – by "frame-up" – is highly probative in rebutting defendant's "good faith" defense. When intent, motive or lack of mistake are in issue, evidence of prior similar and

---

[65]  Rule 404(b) Other Crimes, Wrongs, or Acts. –

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause...

[66]  Uncharged Misconduct Evidence § 7:02:

> Intentional torts present the strongest analogy to criminal misconduct. As in a criminal prosecution, the plaintiff's most difficult problem of proof is often establishing the defendant's wrongful intent.  Thus, like a prosecutor, the civil plaintiff often has occasion to introduce uncharged misconduct to prove intent.

See also *Admissibility of Evidence of other Crimes, Wrongs or Acts under Rule 404(b) of the Federal Rules of Evidence*, in civil cases, 64 ALR Fed 648.

39

1  related offenses tending to show a consistent pattern of conduct is admissible if accompanied by

2  appropriate cautionary instructions.[67]

3

4

5

6  And such evidence includes subsequent acts of misconduct[68] – consistent with plaintiffs

7  proffer.

8  Nor does the time that has elapsed since the prior misconduct bar its admission.[69]

9  The trial court's reasoning in a prosecution for wire fraud and conspiracy is applicable

10  here.[70] Evidence of other wrong acts committed by defendant after she was indicted was

11  admissible *to show absence of mistake* where *defendant's theory of defense was denial of conduct*

12  *alleged and good faith.*[71]

13

14  ─────────────────

15  [67]  U.S. v. Nemeth, C.A.6 (Ky.) 1970, 430 F.2d 704.

16  [68]  U.S. v. Olivo, C.A.10 (Okla.) 996, 80 F.3d 1466, *certiorari denied* 117 S.Ct. 265,
        519 U.S. 906, 136 L.Ed.2d 189, holding that trial court properly admitted subsequent
17      similar acts as evidence to show intent, knowledge, and lack of accident or mistake,
        where both subsequent act and charged offense involved the same *modus operandi* of
18      transportation and concealment of large quantities of marijuana.

19  [69]  See U.S. v. Ross, C.A.9 (Wash.) 1989, 886 F.2d 264, *certiorari denied* 110 S.Ct.
20      1818, 494 U.S. 1083, 108 L.Ed.2d 947, holding that evidence that defendant had
        improperly used his wife's social security number thirteen years before acts underlying
21      current charges for improperly using his wife's social security number was not so remote
        as to prevent admission of such evidence to negate defendant's claim of mistake and to
22      show intent.

23  [70]  U.S. v. Wonderly, C.A.8 (Neb.) 1995, 70 F.3d 1020, *cert denied* 116 S.Ct. 1443,
24      517 U.S. 1146, 134 L.Ed.2d 564.

25  [71]  See also Lenard v. Argento, C.A.7 (Ill.) 1983, 699 F.2d 874, *certiorari denied* 104
26      S.Ct. 69, 464 U.S. 815, 78 L.Ed.2d 84, on remand (holding that generally, evidence of
        other criminal activities is inadmissible unless the evidence of the other crimes or
27      misconduct is relevant, and it is relevant if it bears upon the intent, knowledge, or
        absence of mistake or accident of the defendant); U.S. v. Semak, C.A.6 (Mich.) 1976,
28      536 F.2d 1142 (evidence of a defendant's prior misconduct is admissible to show motive,

40

### F.  FBI misconduct evidence is admissible on a proper assessment of punitive damages

Several courts have held evidence concerning other acts or assaults upon third persons admissible when the plaintiff was seeking to recover exemplary damages. That reasoning applies to constitutional violations as well.

In a 9th Circuit action alleging racial discrimination in housing, it was held that prior statements of the defendant indicating his racial prejudice were properly admitted under Rules 404(b) and Rule 403 of the Fed. R. Evid. for the purpose of showing his intent and the appropriateness of a punitive damage award.[72]

Where the issue was one of knowledge on the part of the principal in the wrongful assaults of the agent prior to the occurrence complained of, one court held that evidence of prior assaults by the agent was competent to show that the principal was tainted with personal guilt amounting to knowledge or its equivalent.[73] The court in that case noted that since evil intent is or may be an important factor in the awarding of exemplary damages, evidence of similar prior acts of the agents (employees) was admissible in showing what the court termed "presumed malice."

---

[72] intent, or absence of mistake whenever any one of those is material to the prosecution and there exists a dispute about it).
Stitt v. Puccinelli, (1980, CA9 Cal) 6 Fed Evid Rep 1124.

[73] Kurn V. Radencic, 141 P2d 580, (1943 Okla).

41

1   A seller of commodity options appealed a jury finding of fraud and complained of the

2   admission of two items: (1) evidence of a prior consent decree against seller, and (2) testimony

3   of other of defendant's customers.  The court of appeals rejected appellant's

4   arguments.[74]  As to the admission of the consent decree, the court said:

5

6       The consent decree was admitted solely for the purpose of demonstrating First
        Commodity's knowledge and intent to commit the fraud insofar as knowledge and
7       intent are relevant to the issue of punitive damages.  See New England
        Enterprises, Inc. v. United States, 400 F.2d 58, 70 (1st Cir. 1978).

8
    As to the challenged admission of testimony of other First Commodity customers, the
9
    court held:
10

11      On the issue of punitive damages, the testimony of other customers about
        representations made by First Commodity through its agents was properly
12      introduced to show First Commodity's absence of mistake and its intent to defraud
        the public.  See Colonial Refrigerated Transportation, Inc. v. Mitchell, 401 F.2d
13      541 (5th Cir. 1968).

14      In rejecting appellants' argument that the punitive damage award was the result of bias

15  and prejudice, the court noted that "[t]his argument rests largely on appellant's assertion that the

16  similar occurrence evidence discussed *supra* should have been excluded," and answered: "Our
17
    holding that such evidence was admitted and properly could have been considered by the jury on
18
19  the issue of punitive damages is a complete answer to this argument."  In accord:  Carr v. Galvin,

20  650 SW2d  864 (1983).

21      This reasoning is also applicable in actions based on the intentional tort of assault.  "[I]f

22  exemplary damages are sought for the assault, evidence of prior  assaults is admissible on the

23  issue of exemplary damages."  Burleson v. Finley, 581 SW2d 304, 308 (1979), citing Jacques V.
24
25  Ellis 219 SW2d 104 (1949 Tex).

26

27  _____

28  [74]   Kerr v. First Commodity Corp. of Boston, 735 F.2d 281 (8th Cir. 1984).

42

In <u>Anello v. Savignac</u>, 342 NW2d 440 (1983), a teacher's action against a high school student for battery, the Court of Appeals of Wisconsin held that evidence of five earlier fights was properly admitted to prove the defendant's malicious intent for the purpose of establishing punitive damages: "The jury could reasonably infer from Patrick's history of assaultive behavior that he acted maliciously." The court also noted that evidence of the prior assaults went to the purpose of punitive damages: "Patrick's five previous fist fights demonstrate a malicious intent and a need for deterrence."

## Conclusion

The OPD has introduced evidence relating to the FBI in general and not just the defendants. Thus, plaintiffs should be given similar leeway. Fed. R. Evid. 404(b) applies to non-defendants where such evidence is otherwise relevant.[75] In this conspiracy case, each defendant is responsible for the overt acts of his fellow conspirators. Accordingly, each allegation against an individual defendant should be considered to be made against all defendants. Here, it is clear that plaintiffs' evidence is not meant for propensity, but to show common Fed. R. Evid. 404(b) exceptions, in addition to showing that the OPD's reliance was patently unreasonable. The prejudice by the inclusion of this evidence would not be "unfair" – and in any event can be ameliorated by contemporaneous and subsequent limiting instructions. Additionally, the offer could be introduced with a minimal expenditure of judicial resources

---

[75] <u>United States v. McCourt</u>, 925 F.2d 1229, 1233-1234 (9th Cir. 1991): "It therefore appears that Congress knew how to delineate subsets of 'persons' when it wanted to, and that it intended 'a person' and 'an accused' to have different meanings when the Rules speak of one rather than the other. Because 404(b) plainly proscribes other crimes evidence of 'a person,' it cannot reasonably be construed as extending only to 'an accused.'"

43

1  should the Court limit the offer to permitting cross-examination on the wrongdoing or permitting

2  expert testimony on the subject.

3      For these reasons, and for those set forth above, plaintiffs respectfully ask the Court for

4  leave to introduce FBI uncharged misconduct evidence.

12  DATED: May 14, 2002.

14                                          Respectfully submitted,

16                                          _____
                                           DENNIS CUNNINGHAM
17                                          ROBERT BLOOM
                                           J. TONY SERRA
18                                          BEN ROSENFELD
                                           Attorneys for Plaintiffs

20      *Of Counsel:*
            John H. Clarke*
21          John Tanghe, Third-Year Law Student, Boalt Hall

22      Plaintiffs gratefully acknowledge the invaluable assistance of Heidi Terbrack, Carol

23  Dorchin and Alicia Littletree in the preparation of this Offer of Proof.

25                          **CERTIFICATE OF SERVICE**

26      I am a citizen of the United States, over the age of 13, and not a party to this action.  I

27  certify that I served true copies of PLAINTIFFS' OFFER OF PROOF REGARDING FBI

   MISCONDUCT, along with the APPENDIX thereto, on defendants by hand to their respective

28

                                          44

1  counsel, R. Joseph Sher and Maria Bee, on May 14, 2002.

                                             _____
                                             DENNIS CUNNINGHAM

*       Not Admitted in California

45